Argued July 12, affirmed September 27, 1977

HARDWICK, *Respondent/Cross-appellant,*
*v.*
DRAVO EQUIPMENT COMPANY,
*Appellant/Cross-respondent.*
(No. 5612, SC P2511)

569 P2d 588

John R. Bakkensen, Portland, argued the cause for appellant/cross-respondent. With him on the briefs were Miller, Anderson, Nash, Yerke & Wiener, Portland.

Richard O. Thomas, Portland, argued the cause for respondent/cross-appellant. With him on the brief were Gaylord & Thomas, Portland.

BRYSON, J.

Lent, J., specially concurring opinion.

**BRYSON, J.**

Plaintiff is a contract logger for Kinzua Corporation. He purchased a new Barko diesel log loader from defendant Dravo Equipment Company on September 17, 1974. Plaintiff subsequently discovered the loader had certain defects and revoked his acceptance of it on May 19, 1975. He then brought this action for breach of contract.

The jury made a special finding "that Plaintiff righfully [sic] revoked his acceptance of the Barko 350 Loader" and awarded him the following damages: return of the purchase price ($58,000); lost profits ($37,500); personal property taxes ($622.01); and insurance premiums ($877.50). The jury also awarded defendant a $6,000 setoff against plaintiff for the reasonable rental value of the loader. The trial court entered judgment on the verdict. Defendant appeals and plaintiff cross-appeals.

Defendant only appeals from that part of the judgment awarding lost profits. Also, defendant does not contest the jury's findings that plaintiff properly revoked acceptance under ORS 72.6080,[1] nor does it

---

[1] ORS 72.6080 provides:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:

"(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

[ 621 ]

contest the availability of the remedies plaintiff sought under ORS 72.7150.[2]

Defendant first contends that "[t]he trial court erred in denying defendant's motions to strike plaintiff's claim for lost profits." The defendant has combined under this single assignment of error the trial court's denial of three of defendant's motions to strike plaintiff's claim for lost profits.

■ Defendant's first motion contended that plaintiff had not introduced sufficient evidence to justify submitting plaintiff's claim for lost profits to the jury.

We are concerned here with plaintiff's evidence relating to lost profits. This part of plaintiff's case was based largely on the testimony of his expert witness, Dr. Dennis Dykstra, whose expertise is not questioned by defendant. Generally, plaintiff chose to prove his alleged lost profits by showing how many additional logs he could have loaded during the claim period[3] if he had had the use of the Barko log loader. After determining the number of additional logs, this was multiplied by the price of the additional logs from which was substracted the expenses in connection therewith.

---

[2]Plaintiff sought consequential damages under ORS 72.7150, which provides:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include:

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented *by cover* or otherwise; and

"(b) Injury to person or property proximately resulting from any breach of warranty." (Emphasis supplied.)

[3]The "claim period" is the time from May 19, 1975, when plaintiff quit using defendant's loader, through August 19, 1975, when plaintiff bought a new loader.

Dr. Dykstra prepared for trial by examining plaintiff's records and inspecting the site of plaintiff's logging operation. As to the quantity of logs plaintiff could have loaded, Dr. Dykstra testified that the Barko loader, together with plaintiff's original loader, would have been able to load all the logs that plaintiff's existing equipment could "skid" from where the trees were felled to the loading area. With two log loaders plaintiff could have "loaded" as much as he could "skid." Thus, plaintiff's lost production would be equivalent to the difference between his total skidding capacity and his actual production with only one loader.

Dr. Dykstra determined plaintiff's skidding capacity as follows. From his inspection of the site, he determined that the average skidding distance was 700 feet. From his inspection of plaintiff's scale tickets, he determined that the average log volume was 200 board feet. From his inspection of plaintiff's seven skidding machines, and by use of a recognized formula, he determined that each machine could skid 1,000 board feet of timber in 19.25 minutes. He further testified that each machine could operate eight hours per day. On this basis he testified that each skidding machine could skid 24,960 board feet per day.

From plaintiff's records, Dr. Dykstra next testified that there were 65½ working days during the claim period which, multiplied by plaintiff's seven machines, gave 458½ machine days. Multiplying that figure by 24,960 board feet per machine-day, he calculated a potential total production of 9,946,560 board feet. Subtracting plaintiff's actual production of 5,897,280 board feet, he determined that plaintiff's total net lost production for the claim period was 4,049,280 board feet.

There was evidence that during the claim period plaintiff was not under a quota with the Kinzua mill and so could have sold as many logs as he could produce. He received a net payment for the logs of $22

per thousand board feet for 30 days during the claim period and $24 per thousand board feet for 35½ days during the remainder of the claim period. Applying these prices to the lost production yields, he testified there was a lost gross income of $93,473.35.

On the expense element of the proof of lost profits, Dr. Dykstra testified that plaintiff would have needed four additional employees, working 13 hours per day. He assumed that plaintiff would pay these employees time and one-half for overtime and that he would have to pay 24 percent above wages for payroll taxes and insurance. At plaintiff's wage scales, the additional labor costs would have amounted to $27,040.30.

Dr. Dykstra next calculated plaintiff's equipment costs by using a formula accepted in the forest industry that such costs are no more than 90 percent of the depreciation of the equipment. These costs, for the loaders and the skidding machines, would have been $9,759.24. Finally, Dr. Dykstra made an additional adjustment to lost profits of $937, reflecting the depreciation of a new loader plaintiff bought and an income tax credit for purchasing the machine.

Based on this data, Dr. Dykstra testified, over defendant's objection, that plaintiff's net lost profits were $57,610.81. In order to verify this estimate, he also testified that he had examined plaintiff's actual production with two loaders. The comparison periods were from December 1, 1975, through February 15, 1976, and in June, 1976. Both periods were after the claim period. Dr. Dykstra chose these periods because, as in the claim period, plaintiff was not under a quota. In Dr. Dykstra's opinion, plaintiff's production during these two periods supported his estimate of plaintiff's lost production during the claim period.

With one exception, pertaining to average log volume as hereinafter discussed, defendant made no objection to the admissibility of any of Dr. Dykstra's testimony. Instead, defendant moved to strike plaintiff's claim for lost profits on three grounds.

Defendant first argues that the evidence failed to support plaintiff's claim for lost profits. In *Kwipco, Inc. v. General Trailer Co.,* 267 Or 184, 188, 515 P2d 1317 (1973), we stated the test for evidence needed to support a claim for lost profits:

> "This court has adopted the rule that damages are recoverable for loss of future profits only to the extent that the evidence affords a sufficient basis for estimating the amount of such profits with reasonable certainty. [*Douglas Const. v. Mazama Timber,* 256 Or 107, 115, 471 P2d 768 (1970).] As stated more recently, '* * * the essential ingredient of proof of lost profits to a reasonable certainty is supporting data.' [*Verret v. Leagjeld,* 263 Or 112, 115, 501 P2d 780 (1972).]'" (Footnotes omitted.)

Plaintiff's evidence met this test. The "supporting data" supplied by Dr. Dykstra was from his personal inspection of the site, from his inspection of plaintiff's records, and from his expert knowledge. With the one exception, hereinafter discussed, all of plaintiff's testimony was admitted without objection and therefore its admissibility cannot be challenged on appeal. *Shields v. Campbell,* 277 Or 71, 77, 559 P2d 1275 (1977). This testimony, outlined above, was sufficiently detailed to prove lost profits to a reasonable certainty.

Defendant's second reason for striking plaintiff's claim for lost profits was that the comparison testimony by the plaintiff's expert was irrelevant because the comparison periods were after the claim period. Even without the comparison testimony, plaintiff's expert had provided sufficient supporting data, as heretofore related, to support the claim for lost profits. Assuming, arguendo, the comparison testimony to be irrelevant, plaintiff still had sufficient evidence to support his claim, and the trial court did not err in refusing to strike the claim.

■ Defendant's final argument for its motion to strike was that the expert failed to consider plaintiff's actual production under other circumstances as bearing on the accuracy of the expert's estimate of plaintiff's lost

profits. For example, during the claim period plaintiff hired a second loader for eight or nine days, and during that time plaintiff's total production was not as high as Dr. Dykstra testified it would have been if plaintiff had two loaders. However, this and defendant's other examples of factors that Dr. Dykstra did not consider were matters going only to the weight of his testimony. "The general rule is that the reasoning and facts upon which an expert expresses his opinion goes only to its weight." *Chance v. Alexander,* 255 Or 136, 139, 465 P2d 226 (1970). Defendant's cross-examination of Dr. Dykstra brought out these possible flaws in his analysis, thus presenting a question for the jury. The testimony elicited on cross-examination did not, however, require striking plaintiff's claim. Thus, the trial court did not err in allowing this issue to go to the jury.

██ Defendant also argues that plaintiff failed to mitigate his damages, as required by the avoidable consequences rule of ORS 72.7150(2)(a), by failing to "cover" or obtain another loading machine. However, the defendant had the burden of proving that minimization of damages was possible. *Pearson v. Sigmund,* 263 Or 626, 634, 503 P2d 702 (1972); *Enco, Inc. v. F. C. Russell Co.,* 210 Or 324, 339, 311 P2d 737 (1957). Defendant did introduce some evidence on this point, and the jury was instructed, per defendant's request, on the avoidable consequences rule. Plaintiff also introduced evidence to show that he did obtain another machine within a reasonable time. This conflict in the evidence presented a question to be resolved by the jury.

█ Defendant's final contention is that the trial court erred in allowing Dr. Dykstra to testify, over objection, that the average volume per log was 200 board feet, based on his inspection of plaintiff's load tickets when those load tickets were not introduced into evidence.

Prior to defendant's objection, Dr. Dykstra had testified:

"A * * * And I also was interested in determining the average volume of an individual log. That's rather easy to do from the load ticket information because loads are each weighed, sample loads are also scaled and each piece is measured, it's [sic] volume is determined. So that by inspecting those, it is possible to determine what the average volume of a piece [log] loaded on his trucks would be.

"* * * * *.

"A The scalers measure the diameter at the small end and the length and from that use a volume table to estimate the volume.

"* * * * *.

"Q Did you verify Mr. Hardwick's records with respect to the load tickets against Kinzua's records?
"A Yes, I did.
"Q Did they match up?
"A They reconciled exactly."

In *Shepherd v. Hub Lumber Co.,* 273 Or 331, 349, 541 P2d 439 (1975), we stated:

"* * * In order for a 'summary' of accounting records to be admissible, all of the original records which set forth the facts and figures which are the basis for such a 'summary' must be produced in court for inspection by the opposing party for the purpose of verifying the accuracy of the 'summary.' See ORS 41.640(1)(e); McCormick on Evidence 2d 564, § 233 (1972). * * *"

The record shows that after plaintiff's objection and following colloquy between the court and counsel, the trial court required plaintiff to make the boxes of "load tickets" available in court for defendant's inspection. Therefore, defendant was in a position to inspect the load tickets and cross-examine Dr. Dykstra on the accuracy of his summary and computation to determine if his expert opinion should be modified. *Samuel v. Vanderheiden,* 277 Or 239, 246, 560 P2d 636 (1977). We conclude that the trial court did not err, under the facts of this case, in allowing plaintiff's expert to

[ 627 ]

testify as to the average volume per log based on his inspection of plaintiff's load tickets.

Plaintiff cross-appeals and first contends the court erred in granting defendant's motion to strike plaintiff's request for attorney fees. From our examination of the complaint, and as argued by the defendant, it appears that plaintiff demanded attorney fees as part of his consequential damages under ORS 72.7150 and not as a contractual right.

Plaintiff's claim that ORS 72.7150 allows recovery of attorney fees as consequential damages must be rejected, and a request for attorney fees based on a contract must be pleaded and proved. *Draper v. Mullennex et al,* 225 Or 267, 271, 357 P2d 519 (1960).

> "The law is well established that in the absence of a contractual or statutory provision a litigant is not entitled to attorney fees in addition to the ordinary costs. * * *" *Brookshire v. Johnson,* 274 Or 19, 544 P2d 164 (1976).

In *Hughes v. Bembry,* 256 Or 172, 177-78, 470 P2d 151 (1970), we stated:

> "We have adopted a narrow policy on the allowance of attorney fees and held that they will not be allowed unless expressly authorized by a statute or a contract. * * *"

Plaintiff offers no persuasive argument that the Uniform Commercial Code was intended to change this rule.

Plaintiff next contends that the trial court erred in denying his motion to strike defendant's request for a setoff against plaintiff for the reasonable rental value of the Barko loader. Plaintiff argues there was no evidence of the reasonable rental value of such a loader. We disagree. Defendant's expert witness was asked "whether or not [he had] an opinion to the fair and reasonable rental value of a Barko loader 350 on a monthly basis," which he answered affirmatively. He then testified:

> "A   A machine of this nature normally is rented on a

lease with an option to purchase, or so-called lease pay out, a conditional sales contract, and the monthly charge for a machine of this nature would vary depending upon applications, the time of the year, a number of factors, but by and large about two thousand five hundred dollars a month."

On cross-examination the witness testified:

"Q   So that $2,500.00 figure really applies to the sale of equipment?

"A   It would be if he buys it. If he doesn't, then it becomes rent. * * *"

In addition, plaintiff's expert testified to the value of the Barko loader and its annual depreciation. This testimony is sufficient to allow the jury to arrive at the reasonable rental value of the Barko loader without speculation.

Further, the trial court instructed the jury that if they determined plaintiff was entitled to recover damages from defendant, they could deduct from such damages the reasonable rental value of the loader from the date of delivery until defendant received notice of revocation. No exception was taken to this instruction. We find no error in this respect.

■   Plaintiff finally argues that the trial court erred in granting defendant's motion to strike plaintiff's claim for finance charges. Plaintiff's evidence on this point showed that plaintiff had paid interest in the amount of $9,900.79 for the Barko loader and other pieces of equipment. Plaintiff failed to introduce evidence concerning the interest charges attributable to the Barko loader alone, leaving the jury no evidence on which to determine the amount of interest plaintiff paid on the Barko loader. The trial judge allowed defendant's motion on this basis; thereafter, plaintiff made no attempt to reopen his case to supply the missing evidence. Given this state of the record, the trial judge did not err in allowing the motion to strike.

Affirmed.

**LENT, J.,** specially concurring.

I concur in the opinion of the court as to the result reached.

I cannot, however, endorse that portion of the opinion concerning the quantum of proof necessary to establish a claim for lost profits. It is true that a line of decisions of this court has established the rule that to recover for lost profits the claimant's evidence must afford a sufficient basis for estimating the amount of such profits with "reasonable certainty." *See, e.g., Kwipco, Inc. v. General Trailer Co.,* 267 Or 184, 188, 515 P2d 1317 (1973). Since both plaintiff and defendant presented this case upon the basis of the rule of those cases, there is no occasion for me to dissent from this portion of the opinion of the court.

The genesis for this rule in Oregon appears to be *Blagen v. Thompson,* 23 Or 239, 31 P 647, 18 LRA 315 (1892). There, in an action to recover damages for breach of contract in which there was a claim for lost profits, the court quite properly stated that one may recover such damages "including gains prevented as well as losses sustained" as were reasonably found or supposed to have been within the contemplation of the parties at the time of the making of the contract as "proximate and natural consequence" of a breach. The opinion went on, however, to quote the "admirable statement of the rule" from a New York case:

> "* * * that the party injured is entitled to recover all his damages, including gains prevented as well as losses sustained; and this rule is subject to but two conditions: The damages must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, that is, must be such as might naturally be expected to follow its violation; and they must be certain, both in their nature and in respect to the cause from which they proceed." *Griffin v. Colver,* 16 NY 489 (1858). (I quote from the original rather than from *Blagen* because the quote in the Oregon Reports is not exact. I perceive no substantive change in meaning, however.)

[ 630 ]

It is not clear to me what the author of *Griffin* meant by his use of the word "certain." I needn't deal with his term, however, because the succeeding Oregon cases, from *Blagen* to the opinion of the court in this case, have at least reduced the quantum from certainty to reasonable certainty.[1]

I must confess, however, that I have no more idea what reasonable certainty means than I have as to the meaning of certainty. I would assume that it is some lesser quantum of proof than that we require in criminal cases; namely, proof beyond a reasonable doubt or to a "moral certainty." We have interpreted that quantum as meaning that the facts asserted are "almost certainly true." *Cook v. Michael,* 214 Or 513, 527, 330 P2d 1026 (1958).

Logically, my next inquiry must be whether reasonable certainty means something more or less than the quantum of proof produced by clear and convincing evidence. In *Cook* we stated that to mean that the truth of the facts asserted is "highly probable."[2]

Prior to *Cook* trial judges very ·often instructed juries that the party having the burden of proof in a civil case had to establish his case by a preponderance of the "satisfactory evidence" and then gave the statutory definition of that term:

> "Satisfactory evidence is that which ordinarily produces moral certainty or conviction in an unprejudiced mind. It alone will justify a verdict. Evidence less than this is insufficient evidence." ORS 41.110.

In *Cook* this court rejected the use of that definition in civil cases and further stated that proof by a prepon-

---

[1]This court has sometimes indicated that the rule is peculiar to tort actions. *See, e.g., Randles v. Nickum & Kelly S. & G. Co.,* 169 Or 284, 286, 127 P2d 347 (1942). The court has applied the rule, however, both in cases *ex contractu* and *ex delicto.*

[2]Carelessness in the use of terms describing the quantum of proof also originates with the legislative branch. *See* use of the term "clear and satisfactory evidence" in ORS 756.594 as quoted in *Dickinson v. Davis,* 277 Or 665, 668, 561 P2d 1019 (1977). For the purpose of this specially concurring opinion, I have no desire to open that can of worms.

derance of the evidence means that the trier of fact must believe that the facts asserted are more probably true than false.

Whether there should be *any* varying quanta of proof in civil cases is probably not an appropriate subject of discussion with respect to the case at bar. I would note, however, that since 1862 (General Laws of Oregon, § 835 (Deady 1862)) the statutes have provided that in civil cases the finding shall be according to the preponderance of evidence. See ORS 17.250(5). Perhaps the bench, the bar, and the public would be better served by abandonment in civil cases of all discussions of the necessary quantum of proof other than those imposed by statute. Especially I conceive this to be so with respect to those labels which have no precise meaning which I am able to apply in testing evidence for submission to the trier of fact.