Roger LEININGER, Plaintiff and Appellee,

v.

Marvin SOLA, Defendant and Appellant.

Civ. No. 9991.

Supreme Court of North Dakota.

Dec. 22, 1981.

Garcia & Garcia, Devils Lake, for defendant and appellant; argued by David Garcia, Devils Lake.

Sproul, Lenaburg, Fitzner & Walker, Valley City, for plaintiff and appellee; argued by Earl R. Pomeroy, III, Valley City.

PAULSON, Justice.

This is an appeal from the District Court of Griggs County denying the appellant's motion for a new trial. Unless the plaintiff will consent to a remittitur in the amount of $6,792.50 we will grant a new trial.

This case was tried in the District Court of Griggs County on March 24, 1980. The district court awarded judgment for the plaintiff, Roger Leininger, against the defendant, Marvin Sola, in the amount of $29,233. Judgment was entered against the defendant who moved for a new trial, pursuant to Rule 59 of the North Dakota Rules of Civil Procedure. A hearing on the motion was held and the court denied the motion for a new trial on the ground that there was sufficient evidence to sustain the court's findings at trial.

The facts of this case involve a warranted sale of dairy cattle by Sola to Leininger and the resulting loss to Leininger from the breach of warranty.

The record shows that in late October, 1978, Leininger visited Sola at his farm and asked him about dairy cows that Sola was offering for sale. Leininger testified that he told Sola that he was looking for cows that would be calving in December of 1978 because he intended to get into the milk business at that time. In preparation for the beginning of dairy operations at his

farm, Leininger remodeled a barn and installed a milking parlor at a total cost of $23,000. Leininger further testified that Sola told him at the October, 1978, meeting that the 23 cows which were for sale would all be calving either in December of that year or in early January of 1979, and that the cows' bred status had been verified by veterinarian pregnancy testing. Following a second visit to the Sola farm to inspect the animals, Leininger agreed to purchase the cows for a price of $700 per head. Leininger arrived to pick up the cows on December 8, 1978, and spoke again at that time with Sola who, according to Leininger's testimony, emphasized that the cows would all be calving in December of 1978 or January of 1979, and that this had been verified by veterinarian pregnancy testing. Sola testified at trial that he was aware that Leininger was in the process of beginning a milking operation and Sola maintained that he believed that all of the cows would calve in early 1979. He also testified that he knew that non-pregnant cows would be of no use to Leininger in his proposed dairy operation.

Some 16 cows were transported in the first two loads without incident, but during the final haul of seven cows the trailer slid into a ditch and stood at a downward incline of approximately thirty degrees. The truck and trailer were pulled back onto the road by a passing pickup truck. Inspection of the cows immediately after the incident and at later times showed the animals to have been uninjured by the sliding of the trailer. In addition, there was no indication or testimony that the sliding of the trailer caused any of the purchased cows to abort.

One calf was born in January of 1979; two more were born in February of 1979; and a fourth was born in March of 1979. During March of 1979, Leininger observed that one of the cows was in heat. Leininger testified that after learning this fact he immediately tried to contact Sola for an explanation, and he eventually reached Sola in late April, at which point Sola advised him to have the remaining cows pregnancy tested. In early May, Dr. L. C. Larson, a veterinarian, checked those cows which had not calved and determined that nine of such cows were several months from calving and ten were not pregnant at all. Thus, with nine cows which would not produce milk for several months and ten cows which had not been bred, Leininger sought to limit the financial damages he was experiencing and bought a bull for the unbred cows. Leininger and Sola met to discuss the pregnancy test results on June 16, 1979. At that time Sola offered to buy back the ten unbred cows for their original purchase price and to provide Leininger with some hay for feeding them throughout the winter. Leininger, however, refused this offer as wholly inadequate. The next day Sola's wife telephoned Leininger and informed him that they were going to disregard the settlement demand received from Leininger's counsel.

In August of 1979, two of the nine cows identified by the veterinarian as having been bred calved and the remaining seven cows calved in September. Dr. Larson testified that the nine cows had to have been bred prior to the December 8, 1978, purchase of the animals because the gestation period for cows ranges from 274 to 291 days. At the time of trial, eight of the ten cows which were open calved and each producing cow was providing salable milk as soon as marketing standards would allow.

The trial court in its memorandum decision stated:[1]

1. That Sola made express warranties to Leininger that the twenty-three cows would all calve in December of 1978 or January of 1979, and this warranty was part of the basis of the bargain between the parties. Only one of the cows calved within the warranted period.

2. No limitations were imposed upon the remedies available to Leininger in the event of breach at the time the contract was entered into. The single settlement offer made by Sola was rightfully rejected by Leininger and did not become the exclusive limiting remedy for Sola's breach of warranty.

1. The findings of fact parallel and are not in conflict with the memorandum decision.

3. That Leininger gave proper notice of the nonconforming nature of the cows to Sola within reasonable time of discovering the breach.

4. That Leininger acted reasonably to mitigate the losses realized from the breach of warranty and to effect cover for the nonconforming goods. Keeping the unbred cows and buying a bull to breed them was much cheaper than selling the cows at slaughter value and purchasing bred, late term cows as required by the contract.

5. That Leininger is entitled to actual damages in the amount of $2,380, which represents the difference between the value paid for the ten unbred cows and their slaughter value at the time of purchase.[2]

6. Prior to contracting with Leininger, Sola knew of the particular requirements of Leininger, namely, that the cows would have to calve shortly after purchase to begin producing milk for his new dairy operation. The complete failure of the cows to be as warranted resulted directly in lost production and income therefrom for Leininger.

7. The consequential damages in this case can be reasonably ascertained from the evidence submitted by Leininger as to the number of days of lost production he suffered due to the nonconforming nature of the cows, the average daily milk production lost, and the approximate price of the product during the period of lost production. The resulting calculation results in consequential damages for the months of lost production at $26,853.

The consequential damages were calculated as follows:

A. Two cows began producing milk in February, one month after the warranty, for a loss of two months' milk production.

B. One cow freshened in March, resulting in a two-month loss of milk production.

C. Two cows freshened in August, seven months after warranty, for 14 months of lost production.

D. Seven cows calved and began milk production in September, eight months late, for a loss of 56 milk production months.

E. The ten unbred cows lost 12 months of milk production each, for a loss of 120 months of lost production.

F. The total product lost (the sum of A, B, C, and D above) is 194 months, or 5,820 lost production days.[3]

Leininger had the dairy production of the herd tested on March 17, 1980, by an independent testing service. The date was representative of the milk production of the herd, as the cows measured were at various stages of their milk production cycles, and fourteen of the twenty-three cows purchased from Sola were measured, along with other cows. The test determined that the average daily production per cow in Leininger's herd was 46.14 pounds; and the trial court found that the March 17, 1980, test of the production of the herd was representative of its average daily milk production. The market value of the milk production during the months Leininger was losing production was $11 per hundred weight and over. The trial court subtracted $1 per hundred weight for shipping costs to arrive at an approximate net value on lost production of $10 per hundred weight.

In his brief in support of a motion for a new trial and for a stay of proceedings to enforce judgment, Sola submitted the following specifications of error:

1. The evidence was insufficient to show that Sola had given Leininger an express warranty that the cows in question were pregnant.

2. The evidence was insufficient to show that limitations of remedy placed on any warranty that was given by Sola were overcome.

---

2. The value of the ten cows as warranted was $7,000 and their actual value, that is, their slaughter value at the time of tender, was $4,620.

3. The evidence did not specify on which dates of a particular month that a cow went into production, so, for purposes of this computation, the production for the whole month of freshening was included by the trial court.

3. The evidence was insufficient to show that Leininger was entitled to consequential damages as a result of any breach of contract or warranty by Sola. .

Sola, in his brief on appeal, presents essentially the same issues with the exception of two others, which basically allege that the district court erred in finding that the express warranty by Sola involved a date certain for calving. Leininger, however, takes exception to Sola's inclusion of these two issues and claims that they are not subject to review. In support of this argument, Leininger cites *Falkenstein v. City of Bismarck*, 268 N.W.2d 787, 790 (N.D.1978), which quotes from *Davis v. Davis*, 268 N.W.2d 769, 771 (N.D.1978), as follows:

"When a party appeals from an order . . . the review in this court is limited to those grounds which were presented to the district court. However, when there is an appeal from the judgment, the appeal is not limited to those issues raised in a motion . . . . All issues which were properly preserved at the trial and raised on appeal are reviewable."

We believe, however, that the district court's order denying motions for new trial and stay of proceedings adequately disposes of any need for us to address this issue further, wherein the order stated:

4. Although the appeal involves an appeal from the order denying motion for new trial and not the judgment, we will review it, essentially, as an appeal from the judgment. The case of *Hennessey v. Schmidt*, 583 F.2d 302 (7 Cir., 1978), explains that the Federal appellate courts that have addressed the issue have adopted a "clear-intent-of-the-appellant" rationale, which rationale would justify our review of the judgment in the instant case based on a "common sense" approach to the rules adopted by the United States Supreme Court in *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). In *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the Supreme Court indicated that the rules of procedure are to be construed so as to "secure the just . . . determination of every action" and observed that the rules reject the idea that one procedural mistake may preclude a proper decision on the merits.

"The express warranty as to the *approximate* date of calving was all that was found by the Court. That express warranty was sufficient under the circumstances of this case to hold defendant [Sola] liable therefor. The warranty was a principal inducement to the plaintiff [Leininger] to buy the particular cattle as bred milk cows. Defendant was aware of . . . [Leininger's] purpose in buying the cows." [Emphasis in original.]

■ Reaching the merits of this appeal,[4] we take exception only to the trial court's $26,853 award of consequential damages for lost profits. Our discussion examines the issues as raised in Sola's motion for new trial, which are basically the same as those raised in his brief on appeal. Essentially, Sola challenges the sufficiency of the evidence which supported the finding of the existence of a warranty, the award of consequential damages, and the finding of no limitation of remedies.

## I

### DEFENDANT GAVE PLAINTIFF AN EXPRESS WARRANTY THAT THE COWS WERE PREGNANT

The evidence at the trial was sufficient for the district court to find an express warranty that the cows were pregnant. In starting his dairy herd, Leininger was look-

The general practice now followed in the Federal appellate courts when an appeal is mistakenly taken from the order denying the motion for a new trial when it should have been from the judgment is to "regard the error as harmless and treat the appeal as taken from the judgment". *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699 (Ct.App.N.Y.1972), *cert. den.* 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139, 6A Moore's Federal Practice, ' 59.15[1] (2d ed. 1971. *See, also* Wright & Miller, Federal Practice and Procedure: Civil § 2818.

As did the Seventh Circuit Court of Appeals in *Hennessey v. Schmidt, supra* 583 F.2d at 306, we adopt the general rule as stated above, subject to the following qualifications, that is, that:

"... the judgment from which the appellant intended to appeal must be final; it must be clear what judgment is involved; the motion and appeal must have been timely made; and there must be no prejudice to the other party."

ing for cows that were bred and near commencing a milk production cycle. The testimony at trial was that unbred cows would be of virtually no value to Leininger. Sola himself testified that the cows he had would not do Leininger any good for what he was trying to do if they had been open. A natural conclusion that could be drawn from these facts is that Leininger would not have purchased any cows without the express warranty of pregnancy. There is also testimony of an express assurance made by Sola that the twenty-three cows he had for sale were pregnant.

The Uniform Commercial Code as enacted in North Dakota recognizes the existence of an express warranty under the following conditions. Section 41–02–30, N.D.C.C. [2–313 (UCC)], provides:

> "*Express warranties by affirmation, promise, description, sample.*—1. Express warranties by the seller are created as follows:
>
> a. Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> b. Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> c. Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> "2. It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

Cases have found warranties of pregnancy of animals to be questions of fact for the jury. 67 A.L.R.2d 619, 646–647 (1959), citing among others, *McCurdy v. Aylor*, 41 N.D. 187, 170 N.W. 523 (1918).

■ In light of the testimony at trial and the nature of the transaction, the trial court was justified in concluding that affirmations as to the pregnant condition of the cows were made by Sola and they were made part of the basis of the bargain and, thus, created an express warranty that the goods would conform to the description. Therefore, the district court did not abuse its discretion when it denied the motion for new trial on the basis of the insufficiency of the evidence supporting the existence of an express warranty that the cows were pregnant and would calve in December or January.

II

### THE PARTIES MADE NO AGREEMENT AS TO LIMITATIONS OF LEININGER'S REMEDIES IN THE EVENT OF A BREACH

■ Sola contends that Leininger's remedies were limited by contractual agreement. He argues that Leininger's sole remedy in the event of a breach was to return the cows to Sola and recover his purchase price. This argument, however, is unpersuasive. There is no evidence that any statement regarding a limitation of remedies was made before the sale and there is no evidence in the record indicating that Leininger agreed to limit his remedies. On direct examination, Sola testified at trial that he offered to buy back the nonconforming cows when Leininger first notified him that the cows had not calved.

Even if Sola's offer to take back the cows could be considered an offer of a limited remedy, that remedy would not be an exclusive one. Section 41–02–98(1)(b), N.D.C.C. [2–719 (UCC)], provides that resort to such a prescribing remedy is optional unless that remedy is expressly agreed by the parties to be exclusive. The Official Comment to 2–719, UCC, states that:

> "2. Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe

the sole remedy under the contract, this must be clearly expressed."

In the instant case there is no evidence that both parties intended Leininger's sole remedy to be to return the cows in the event of a breach. We also do not find in the record where the parties mutually agreed to a limitation of remedies or where it has been clearly expressed that Leininger was limited to only one remedy. Therefore, the district court did not err in finding that there was no limitation of remedy in the instant case.

## III

### THE PLAINTIFF IS ENTITLED TO CONSEQUENTIAL DAMAGES AS A RESULT OF THE BREACH OF WARRANTY BY THE DEFENDANT

Sola alleges that the evidence was insufficient to show that Leininger was entitled to consequential damages from Sola's breach of warranty. We believe that consequential damages were properly awarded in this case but we disagree because the evidence does not justify the amount of these damages awarded.

■ Sections 41–02–93, N.D.C.C. [2–714 (UCC)] and 41–02–94, N.D.C.C. [2–715 (UCC)],[5] provide that consequential damages can be recovered when goods are accepted, but later are discovered to be nonconforming. In Schneidt v. Absey Motors,

Inc., 248 N.W.2d 792, 799 (N.D.1976), this court recognized that § 41–02–94, N.D.C.C. [2–715 (UCC)], limits damages for breach of a contract to those reasonably foreseeable in consequence of the breach. In the instant case Sola admitted on direct examination that he knew the cows were being purchased to start a dairy operation and that they would not be of any benefit to Leininger if they were not pregnant. Under these circumstances the loss of dairy production from dry, unbred cows was reasonably foreseeable.

The trial court awarded Leininger consequential damages for loss of production and, thus, lost profits, because Sola's breach of warranty delayed milk production significantly. In its memorandum decision, the trial court cited Dold v. Sherow, 220 Kan. 350, 552 P.2d 945 (1976), in which the Supreme Court of Kansas awarded damages for the loss of profits expected from a calf crop. In Dold v. Sherow, supra, the plaintiff told the defendant that he wanted certain cows for calf-production purposes and that he would have no use for the cows if they were not bred. The cows were not pregnancy tested because of the additional expense. The plaintiff in Dold purchased the cows in reliance upon the representations by the defendant that all cows would freshen by April 15, 1973, and were not more than seven years old. When the cows did not calve by the specified date, some

5. Sections 41–02–93 and 41–02–94, N.D.C.C., state in their entirety:

"*41–02–93. [2–714 (UCC)] Buyer's damages for breach in regard to accepted goods.*—1. Where the buyer has accepted goods and given notification (subsection 3 of section 41–02–70) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"2. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"3. In a proper case any incidental and consequential damages under the next section [§ 41–02–94] may also be recovered.

"*41–02–94. [2–715 (UCC)] Buyer's incidental and consequential damages.*—1. Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"2. Consequential damages resulting from the seller's breach include

"a. any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"b. injury to person or property proximately resulting from any breach of warranty."

three months after their purchase, they were pregnancy checked and some were found not to be pregnant and forty of the fifty cows purchased were found to be older than seven years of age. The Supreme Court of Kansas stated that the plaintiff was entitled to consequential damages and that it was in the discretion of the jury to award plaintiff a reasonable amount as damages for lost profits.

Also cited by the trial court was *Bemidji Sales Barn, Inc. v. Chatfield*, 312 Minn. 11, 250 N.W.2d 185, 188 (1977), in which a purchaser sought compensation alleging breach of warranty that breeding cattle had been vaccinated for shipping fever. The Minnesota Supreme Court stated in that case:

"Lost profits, provided they are foreseeable by the seller, are clearly recoverable under § 336.2–714(3), and were long recognized as a form of compensable damage prior to adoption of the Uniform Commercial Code."

The rationale for awarding lost profits as consequential damages is demonstrated by the instant case. Leininger sought cows that would produce milk. Their failure to be as warranted caused Leininger a financial loss. He incurred all of the expenses of starting a dairy operation, including the costs of keeping a dairy herd but, because there was significantly delayed production or no production from nineteen of the twenty-three cows purchased, Leininger was deprived of income from his investment. The only adequate compensation for these damages must go to the benefit that should have been derived from the contract, *i.e.*, milk production.

■ Because of the inherent difficulties in proving consequential damages, such as lost profits, the Uniform Commercial Code requires proof that is reasonable under the circumstances. The Official Comment to the Uniform Commercial Code, § 2–715 states;

"4. The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies rejects any doctrine of certainty which re-quires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances." [1A Uniform Laws Annotated 446 (1976 Master Ed.)]

In *W & W Livestock Enterprises, Inc. v. Dennler*, 179 N.W.2d 484, 489 (Iowa 1970), the Iowa Supreme Court upheld a loss of profits' award, stating:

"The showing required, we have said, is sufficient if the record shows data from which the extent of the injury can be ascertained with reasonable certainty. Data for an exact calculation is not necessary."

In documenting the production lost, Leininger introduced into evidence an independent record of a day's production for each producing cow in his herd. The record was made by an independent employee of the State Cooperative Extension Service and it shows the individual production of fourteen of the twenty-three cows Leininger purchased from Sola, as well as that of several other cows acquired from other sources. The record was made on March 17, 1980, a point at which all of the animals had been bred. This data was valuable in that it showed a representative sample of the herd's production. Because milk production varies throughout a milk production cycle, the fact that the cows were in various stages of their milk production cycles makes the data representative. The district court then calculated the average daily production of milk per cow in Leininger's herd to be 46.14 pounds.

The district court explained in its memorandum decision its reasons for applying this daily production rate figure:

"1. The data which is but a sample of total production is drawn from some of the very cows in question, plus other cows belonging to the same herd.

"2. The seasonal variation in milk production during a lactation period for a particular cow is compensated for in this sample by reason of the fact that the cows in the sample had freshened at various times during the production year.

"3. No other evidence was submitted on which to base the finding of daily milk production."

■ We believe that the trial court's calculations of the days of lost production and daily production rate are reasonable under the circumstances, but that its calculation of lost net profit overlooks a significant production cost which Leininger avoided as a result of the breach of warranty. We discuss this issue later in this opinion in connection with the sufficiency of the evidence supporting the amount of consequential damages awarded.

Within the context of the issue of consequential damages, Sola additionally contends that Leininger was unreasonable in his attempt to mitigate his damages and that the evidence was insufficient to support the amount of consequential damages awarded.

■ Sola first argues that when a buyer has a remedy of cover he cannot recover consequential damages that he could have avoided by cover. The citations used to support his argument require a buyer to mitigate his damages by cover *or otherwise* before he can recover consequential damages. They do not, however, require cover to the exclusion of other means of mitigating damages.

The trial court in its memorandum decision discussed this argument and emphasized that § 41–02–91, N.D.C.C. (2–712 UCC), provides that the buyer *may* cover by making a *reasonable purchase* of or contract to purchase goods in substitution of those from the seller. The court also pointed out that § 41–02–91(3), N.D.C.C., provides that:

"3. Failure of the buyer to effect cover within this section does not bar him from any other remedy."

Both the trial court and Sola cite to the Official Comment to § 2–712 of the Uniform Commercial Code for support, but for different purposes. That Comment states:

"3. Subsection (3) expresses the policy that cover is not a mandatory remedy for the buyer. . . .

"However, this subsection must be read in conjunction with the section which limits the recovery of consequential damages to such as could not have been obviated by cover. Moreover, the operation of the section on specific performance of contracts for 'unique' goods must be considered in this connection for availability of the goods to the particular buyer for his particular needs is the test for that remedy and inability to cover is made an express condition to the right of the buyer to replevy the goods."

In connection with this Comment, the trial court recognized that "Breeding stock has seasonal characteristics, the full details of which have not been made part of this record, but which nevertheless are sufficiently known to make a distinction from ordinary inventoriable merchandise" and stated that the situation in the instant case "is far different from one which would arise if inanimate nonconforming goods were the subject of the transaction".

Sola emphasizes in the Comment to § 2–712, UCC, that portion which states that "this subsection [3] must be read in conjunction with the section which limits the recovery of consequential damages to such as could not have been obviated by cover". Subsection 2 of § 41–02–94, N.D.C.C. (§ 2–715(2), UCC), is the section which discusses the limitation on the recovery of consequential damages, as follows:

"(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;"

The Comment to subsection (2) explains:

"Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. Subparagraph (2)

carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise."

2 Anderson UCC § 2–715:22, this same idea is stated, as follows:

"When the buyer seeks to recover for consequential damages he is barred as to those which he could have reasonably avoided by cover."

*Gerwin v. Southeastern California Ass'n of Seventh Day Adventists*, 92 Cal.Rptr. 111, 117, 14 Cal.App.3d 209 (1971), explains that the concept of cover enables a buyer to make reasonable substitute purchases and to recover those costs while, at the same time, it protects a seller from consequential damages which could have been mitigated by a purchase of substitute goods. In *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784, 805 (1978), the court stated that a plaintiff is only required to take reasonable steps to mitigate damages.

It was stated in *Hardwick v. Dravo Equipment Co.*, 279 Or. 619, 569 P.2d 588, 591 (1977), that the defendant has the burden of proving that mitigation of damages was reasonably possible and that the question of the ability to mitigate damages is a question of fact.

In *Dangerfield v. Markel*, 278 N.W.2d 364, 368 (N.D.1979), in discussing proper cover pursuant to § 2–712, UCC, we stated that the criteria of good faith and reasonable purchase are questions of fact which will not be set aside unless clearly erroneous.

The Official Comment to § 2–712, UCC (§ 41–02–91, N.D.C.C.), states that: "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective."

In the instant case we believe that the same test of acting in good faith and in a reasonable manner are applicable to the question as to whether or not Leininger's attempts to mitigate his damages were reasonable absent his effecting cover by purchasing ten freshened cows. Reviewing this issue of reasonableness as a question of fact we are bound by the findings of the trial court unless we are convinced that a mistake has been made. Rule (52 a), of the North Dakota Rules of Civil Procedure. We believe that the trial court had sufficient evidence to find that Leininger did not unreasonably delay his attempts to mitigate his damages and that such attempts to mitigate his damages were reasonable.

Of the twenty-three cows purchased, four had calves at staggered intervals from January to March. This raised a reasonable expectation that the other cows would also calve at any time. When one cow displayed characteristics of being open Leininger had that cow artificially inseminated. When no further calves were born, Leininger attempted to reach Sola by telephone several times but Sola did not return Leininger's phone calls. Leininger finally reached Sola in late April to notify him of the nonconforming nature of the cows.

Pursuant to the conversation between the parties, a veterinarian was immediately contacted and he pregnancy tested the cows in early May. It was at this time that Leininger learned that milk production from the nineteen cows would be significantly delayed.

Leininger again contacted Sola but they did not meet until June 16, 1979. In the meantime, Leininger purchased a bull and bred the open cows and arranged to graze the cattle in rented pasture throughout the summer.

When the parties met on June 16, 1979, Sola offered to buy back the ten open cows at their original purchase price and to provide Leininger with some hay to provide for the care and feeding of the cows for six months. Leininger rejected this offer. The following day Mrs. Sola telephoned Leininger and informed him that Sola would disregard the counter demands made by Leininger's counsel. There were no further contacts between the parties.

At this point the options available to Leininger involved financial losses. He could have sold the cows and replaced them with other cows in their milk production cycle. However, the district court found that for Leininger to be placed under a duty to "cover" in this manner under these circumstances would not be reasonable because it is cheaper to buy one bull than to buy ten freshening cows.

Testimony at the trial by Leininger on direct examination was to the effect that he had thought about trading off the cows but that from the time they were pregnancy checked in May until June 16, the cows had been bred, were going out to pasture, and were in pretty good shape. He didn't want to sell them because he couldn't get much for them at that time of the year. He further stated that in June of 1979 he would have lost quite a bit and that he would never have gotten back what he had invested in the cows. Also, rescission would have involved financial losses because of the investment Leininger had made in the cows during the six months that they had been in his possession.

Leininger minimized the necessity of further investment of capital by keeping the cows in pasture throughout the summer, at which time nine of the cows were near calving and the other ten cows were one-third of the way through their gestation period.

Based on the facts stated above, we cannot say that Leininger's attempts to mitigate his damages were unreasonable and we believe that the trial court had sufficient evidence to sustain its finding that Leininger's actions to mitigate his damages were reasonable.

On the other hand, Sola has not presented evidence which would indicate to the trial court or this court that Leininger's actions to mitigate his damages were unreasonable when compared to the cost of purchasing ten freshening cows.

■ Sola's second argument within the context of the issue of consequential dam-

ages is that the trial court awarded gross profits to Leininger instead of net profits because it failed to consider the difference between the cost of maintaining producing cows and non-producing cows over a winter. The trial court stated in its memorandum decision that

"The plaintiff was thus forced to feed and care for the cows even though they were not producing milk and bringing him revenue by such production. As a result, the breach of warranty hardly reduced the plaintiff's costs, but acted to deprive him of vital income."

The trial court also stated that Sola's claims were with respect to specific minute factors lacking in the record. The trial court also brought out that its memorandum decision was prepared without the benefit of a written transcript of the trial proceedings. We, however, have the benefit of a transcript and find testimony by Leininger on direct examination that it cost about $150 to winter a stock cow and that it costs him $3 a day for a producing milk cow. He also testified that to winter a stock cow costs about the same as a dry cow. Leininger further testified that "over the winter" means from around the first of November until the cows are put out to pasture in the spring.

In the light of this testimony we do not consider the difference between wintering a producing cow and a dry cow to be a minute factor in the instant case. It is a significant cost of production that Leininger avoided as a result of the breach of warranty.

We assume for purposes of this opinion that Leininger "wintered" the nineteen non-producing cows from December, when he purchased them, until June, when he put them out to pasture. We calculate the cost for wintering the nineteen cows, had they been producing from the January 1 date, the date used by the trial court to determine lost production days, until June 16, to be $9,405.[6] The cost for wintering the nine-

6. This figure was based on a feeding cost of $3 per day per producing cow for the 19 cows for a period of 5½ months, or 165 days.

teen dry cows for this same 5½ month period is $2,612.50.[7] The difference between these two figures is $6,792.50, which represents the feeding costs avoided by Leininger as a result of the breach of warranty.

We believe, therefore, that the trial court's award of consequential damages in the amount of Leininger's estimated lost production, less only shipping costs, is not supported by the evidence. The difference in feeding costs between producing and non-producing cows must be subtracted from the award of consequential damages in order for Leininger to realize the damage award which reflects only his net lost profits. For this reason, unless Leininger consents to a remittitur of $6,792.50, we will grant a new trial on the issue of consequential damages.

Sola additionally pointed out to this court at oral argument that two of the nineteen cows that did not conform to the warranty were sold prior to the trial. This fact, however, was not set out in his motion for a new trial or in his brief in support of motion for a new trial; nor is there any indication in the record as to which of the nineteen cows were sold, when they were sold, and whether or not they were sold after they began producing milk; or whether or not they were among the ten unbred cows. Without such information we cannot say that the evidence was insufficient to an extent that would merit a new trial.

We conclude that there was sufficient evidence in the record to sustain the order of the district court denying the motion for new trial with the exception of the amount of the award of consequential damages. Therefore, unless Leininger consents to a remittitur in the amount of $6,792.50 in a total damage award of $22,440.50, we will grant a new trial on the issue of consequential damages. *See* 59(b)(6), N.D.R.Civ.P.; *Demaray v. Ridl,* 249 N.W.2d 219 (N.D. 1976).

---

**7.** We assume for purposes of this calculation that Leininger wintered the cows from the time he bought them in December until June 16 following, which is approximately 6 months. The cost to winter each of these dry cows was

ERICKSTAD, C. J., concurs.

VANDE WALLE and SAND, JJ., concur in the result.

PEDERSON, Justice, dissenting.

I do not think that the scope of appellate review is the same when there is an appeal from an order denying a motion for a new trial as when there is an appeal from a judgment. Rule 52(a), N.D.R.Civ.P., establishes the guideline for our review of findings of fact. A motion for new trial does not constitute an "action tried upon the facts," and no findings are necessary or appropriate. When Sola elected to seek a new trial on the basis of Rule 59(b)(6), N.D.R.Civ.P.—insufficiency of the evidence—and waive his right to appeal from the judgment, he conceded the correctness of all findings of fact.

The order denying Sola's motion for a new trial should be, in all things, affirmed.

---

$150, which amounts to $25 per cow per month. The total cost for wintering the 19 dry cows for 5½ months is arrived at by multiplying 19 by $25 by 5½, which totals $2,612.50.