Argued and submitted July 6, 1988, affirmed on appeal and on cross-appeal
March 8, 1989

## CALBAG METALS CO.,
*Respondent - Cross-Appellant,*

*v.*

## GUY F. ATKINSON COMPANY,
dba Bingham-Willamette Company,
*Appellant - Cross-Respondent.*

(A8509-05683; CA A44431)

770 P2d 600

Louis H. Henry, Portland, argued the cause for appellant -

cross-respondent. With him on the briefs were Bruce A. Rubin and Miller, Nash, Wiener, Hager & Carlsen, Portland.

John M. Berman, Beaverton, argued the cause and filed the brief for respondent - cross-appellant.

Before Joseph, Chief Judge, and Newman and Deits, Judges.

NEWMAN, J.

## NEWMAN, J.

Defendant (seller) appeals a judgment for plaintiff (buyer) in this action for breach of a contract to sell scrap metal (the scrap metal contract) and of another contract to sell three stainless steel pumps (the pump contract). It asserts that there was no meeting of the minds as to the scrap metal contract and that, if there was, the court erred when it held that buyer did not need to attempt to "cover" or otherwise mitigate its damages after seller repudiated the contract. It concedes that it breached the pump contract but again argues that buyer failed to prove that it covered or otherwise attempted to mitigate damages. On cross-appeal, buyer asserts that, as to the pump contract, the court erred in submitting the issue of mitigation to the jury.[1] We affirm on both the appeal and the cross-appeal.

Because the jury found for buyer, we state the facts most favorably to it. Or Const, Art VII (amended), § 3; *Northwestern Pac. Indem. v. Canutt,* 280 Or 375, 381-382, 570 P2d 1182 (1977). Seller manufactures pumps and turbines at its plant in Portland. Buyer is a dealer in scrap metal. Before 1985, it frequently purchased scrap from seller and its predecessors. Seller accumulated a large quantity of scrap, most of it located in a yard at the rear of its Portland land. Its president decided to clean up its premises and, on July 11, 1985, told Ashmore, an employe, to arrange to dispose of the accumulation as soon as possible.

The next day, July 12, Ashmore met with representatives of several scrap metal dealers, including buyer, and took them on a tour, pointing out the scrap metal that seller wanted to sell.[2] After the tour, buyer's representatives worked out a bid and late that afternoon presented it to Ashmore by telephone. Ashmore told buyer that it had the contract; he then went on vacation. The next Monday, July 15, Singh, Ashmore's superior, called Schwartz, one of buyer's employes, to ask when buyer could start work and to clarify one aspect of

---

[1] Buyer makes two other assignments of error on its cross-appeal but asks us not to consider them if we affirm on the appeal, as we do.

[2] The scrap metal consisted primarily of carbon steel, but there were other materials as well. The parties dispute whether certain stainless steel plate was included and whether buyer's bid was contingent on its inclusion. The jury by its verdict necessarily resolved the contingency issue against seller.

the bid. The following morning, Singh asked Schwartz to come to seller's offices to explain buyer's "bid logic." At the end of the meeting, Schwartz offered Singh a purchase order for the scrap, and Singh accepted it.[3]

On the afternoon of July 16, Singh called Schwartz and told him that seller had decided to offer the scrap metal for rebid in several lots rather than as a unit. Seller had decided that it would receive more money by making the change. Buyer rebid on only one portion and was not the successful bidder on it. It did not bid on the remainder of the scrap, because it concluded that it could not raise its previous bid and still make a profit. Buyer's letter transmitting the rebid reserved its rights under the original bid and showed that buyer had sent a copy to its lawyer.

At the meeting with Ashmore on July 12, buyer also made a contract with seller to buy three stainless steel pumps for scrap (the pump contract). Buyer was to pay for the pumps 30 days after receiving them. After seller received buyer's rebid with the cover letter, one of its employes told Schwartz that seller interpreted the letter as a threat, that it did not like being threatened and that buyer would now have to pay for the pumps in advance. Buyer refused to do so, and seller then refused to deliver the pumps. Buyer filed this action, seeking lost profit damages for the breaches of each of the contracts. The jury awarded it $1724.99 on the pump contract and $86,964.99 on the scrap metal contract.

■　　Seller's first assignment of error is that the court denied its motion for a directed verdict on the scrap metal contract claim. It asserts that there was no meeting of the minds on that contract. Plaintiff presented evidence that Ashmore offered to sell, that buyer made a bid, that Ashmore accepted the bid and that Singh accepted a purchase order that conformed to the bid. If the jury believed that evidence, it could find that there was a meeting of the minds.

Seller's arguments rely on evidence that suggests that its employes believed that buyer's bid was contingent on the

---

[3] The purchase order described the goods as:

"Scrap metal - ferrous and nonferrous metals. Scrap includes, but is not limited to material inspected in scrap area, dock area and bone yard. Bid includes dismantling and removal of three (3) Colby-Whirly cranes."

inclusion in the sale of certain stainless steel plate that, seller insists, it never offered to include. The resolution of conflicts in the evidence was for the jury. It could have found that the actions of the parties manifested an intent that buyer would purchase all the scrap metal that seller had at $10.26 per ton, and that the purchase would include, but not be contingent on, whatever stainless steel plate was available for sale. If so, that was sufficient to form the scrap metal contract and the terms of that contract were sufficiently clear for it to be enforceable. *See Real Estate Loan Fund v. Hevner*, 76 Or App 349, 354-355, 709 P2d 727 (1985).

■ Seller's remaining assignments of error concern buyer's damages on both contracts. We first consider the scrap metal contract. Buyer did not attempt to purchase substitute goods—"cover"—after seller repudiated that contract. Its damages, therefore, are measured under ORS 72.7130(1), which provides, in pertinent part:

> "[T]he measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in ORS 72.7150, but less expenses saved in consequence of the seller's breach."

Buyer presented no evidence that the market price for scrap when it learned of the breach was greater than the contract price. Therefore, buyer did not prove any direct damages under ORS 72.7130(1).[4]

Buyer seeks the profits that it allegedly lost because it was unable to obtain the scrap for resale. Lost profits are consequential damages under ORS 72.7150(2). *See* White and Summers, *Uniform Commercial Code* (2d ed 1980), § 10-4. That statute provides, in pertinent part:

> "Consequential damages resulting from the seller's breach include:

---

[4] Buyer argues that the lost profit damages that it seeks are direct damages, because they are the difference between the contract price at which it would have purchased the scrap and the market price at which it would have sold it. That argument is based on a misunderstanding of ORS 72.7130(1). ORS 72.7130(2) provides that market price "is to be determined as of the place for tender * * *." Comment 1 to the section states that it "uses as a yardstick the market in which the buyer would have obtained cover had [the buyer] sought that relief." Legislative Counsel Committee, *Oregon's Uniform Commercial Code with Comments* (1962), 110.

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and which could not reasonably be prevented by cover or otherwise * * *.*" (Emphasis supplied.)

In order to cover, a buyer must make

"in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." ORS 72.7120 (1).

The issues of buyer's consequential damages concern the effect of buyer's failure to cover or to take other steps to mitigate its damages.

Seller assigns as errors that the court denied its motion for a directed verdict and refused to give several jury instructions on mitigation. The motion and the proposed instructions were based on seller's theory that buyer's failure to cover or otherwise to mitigate its damages deprived buyer of *any* claim for lost profits. The problem with seller's position is that it gave no evidence that there were any substitute goods available that buyer could have purchased after seller repudiated the agreement.

The undisputed evidence is that there was a seller's market for scrap metal in July, 1985; that buyer could sell all that it could acquire; that competition among dealers was to find suppliers, not purchasers; that buyer was actively seeking scrap from all sources during that period; that the failure of the sale from seller did not affect buyer's efforts to purchase other scrap; and that at all times buyer was trying to buy everything that was available at prices that it believed to be profitable. There simply is no evidence that there was scrap that buyer would not otherwise have sought to purchase available to replace what seller had to offer.[5] *See Southern Idaho Pipe & Steel v. Cal-Cut Pipe,* 98 Idaho 495, 504-505, 567 P2d 1246 (1977).

---

[5] Seller argues that buyer did not introduce any evidence that substitute scrap metal was unavailable and that one witness testified that there was always new scrap coming on the market. Buyer's uncontested evidence, however, is that it was actively buying all reasonably available scrap metal but was unable to fulfill commitments that it had made after seller awarded it the bid. There is no evidence that buyer could have purchased scrap to *replace* the scrap that it lost when seller repudiated.

Seller argues that buyer could have covered by rebidding on all of the scrap that it was selling rather than on only one portion.[6] Buyer's employes testified that it limited its rebid to one portion because it did not think that it could profitably increase its bid on the others. *See Hudson Feather & Down Prod. v. Lancer Clothing*, 128 App Div 2d 674, 513 NYS2d 173 (1987). Seller does not dispute buyer's assertion that it made that decision in good faith. ORS 72.7120(1) provides that "cover" is a reasonable purchase made in good faith. Under ORS 72.7150(2)(a), failure to cover will negate consequential damages *only if* cover could reasonably have prevented the loss. The evidence does not permit the conclusion that buyer's action in failing to rebid on all of the scrap was unreasonable. The most that seller showed was that rebidding might also have been reasonable. That, however, is not the standard. *See Chiles v. Robertson*, 94 Or App 604, 633, 767 P2d 903 (1989); *see also Valiga v. National Food Co.*, 58 Wis 2d 232, 244-245, 206 NW2d 377 (1973). The trial court did not err in denying seller's motions for directed verdict or in refusing to submit its proposed instructions on mitigation to the jury.

The court also denied seller's motion for a directed verdict on the pump contract; it did instruct the jury on mitigation on that claim. Seller assigns the denial of the directed verdict motion as error; buyer, on its cross-appeal, assigns as error the giving of the mitigation instructions.

■  Seller breached the contract to sell the pumps by changing the payment terms, but it did not repudiate its obligation to sell the pumps to buyer. Seller argues that buyer should have complied with the new terms and then sought to recover the extra expenses as damages. Buyer argues that it reasonably believed that seller would not deliver the pumps even if buyer were to comply with the new terms and that it was therefore not reasonable for it to comply. There was evidence from which the jury could have found that buyer either did or did not have a reasonable basis for its belief and that it could have reduced its damages at a relatively small cost by complying with the modifications that defendant imposed.

---

[6] ORS 72.7120(1) defines "cover" as the purchase of "goods *in substitution*" (emphasis supplied) for those that the seller did not provide. We will assume for the purposes of this opinion that buying the *same* goods from the seller at a higher price could qualify as cover under that definition.

Because the evidence did not compel the conclusion that buyer acted unreasonably, the court did not err in denying the motion for a directed verdict on the pump claim. The evidence, however, was sufficient to permit the jury to find that buyer could have mitigated its damages but did not do so, *see Rossi v. Mobil Oil Corp.,* 710 F2d 821, 834-835 (TECA 1983), and the court properly submitted the issue of mitigation to the jury. Buyer does not attack the substance of the instructions that the court gave.

Affirmed on appeal and on cross-appeal.