108 F.3d 981
 97 Cal. Daily Op. Serv. 1339, 97 Daily Journal
D.A.R. 2016
CENTRAL OFFICE TELEPHONE, INC., Plaintiff-Appellee-Cross-Appellant,
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY,
Defendant-Appellant-Cross-Appellee.
 Nos. 94-36116, 94-36156.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 8, 1996.
Decided Feb. 26, 1997.
 
 1
 Bruce M. Hall, James T. McDermott, Kathryn D. Whittaker, Ball, Janik & Novack, Portland, Oregon, and J. Richard Urrutia, James, Denecke & Harris, Portland, OR, for the plaintiff-appellee-cross-appellant.
 
 
 2
 David W. Carpenter, Joseph D. Kearney, Sidley & Austin, Chicago, IL, and Milo Petranovich, Lane, Powell, Spears Lubersky, Portland, OR, for the defendant-appellant-cross-appellee.
 
 
 3
 Appeals from the United States District Court for the District of Oregon, John A. Jelderks, Magistrate Judge, Presiding. D.C. No. CV-91-1236-JAJ.
 
 
 4
 Before FERGUSON and BRUNETTI, Circuit Judges, and KING,* District Judge.
 
 
 5
 SAMUEL P. KING, District Judge.
 
 
 6
 American Telephone & Telegraph Company ("AT&T") appeals the judgment of the magistrate judge, following a three-week jury trial, awarding Central Office Telephone, Inc. ("COT") $1.154 million in damages, and denying AT&T's claim for over $1 million in unpaid federally tariffed charges for long distance services, under the Federal Communications Act of 1934, ("Communications Act" or "Act") 47 U.S.C. § 153(h). COT's action against AT&T alleged breach of contract, breach of implied covenant of good faith and fair dealing, and tortious interference with contract. COT cross-appeals the magistrate judge's decision not to allow the jury to consider an award of punitive damages, as well as the magistrate judge's post-trial order reducing the original jury verdict of $13 million in compensatory damages in favor of COT.
 
 
 7
 COT, a reseller of long distance services, entered into a contract with AT&T for Software Defined Network ("SDN") services, which COT later resold to its customers. AT&T is a provider of long distance services and is classified as a common carrier under the Communications Act, 47 U.S.C. § 153(h), and therefore, its long distance services are subject to the requirements of § 203 of the Act, which contains statutory filed tariff requirements.[1] 47 U.S.C. § 203.
 
 
 8
 The tariffs filed with the Federal Communications Commission ("FCC") by AT&T set forth the rates for each of its long distance services. One of the services provided by AT&T is SDN, a long distance service which provides a physically separate long distance network for a customer's long distance service. In addition to describing rates for the service, the SDN tariff limits AT&T's liability for all but wilful misconduct.
 
 
 9
 SDN customers make large volume commitments, and therefore, SDN rates are lower than rates for other AT&T services. Because the set-up of an SDN network is complex, the tariff provides for an up-front installation charge to the customer. Once SDN is set up, the customer may add new locations or drop old ones from the network.
 
 
 10
 SDN has several characteristics attractive to switchless resellers[2] such as COT. It accommodates switched access, allowing resellers to offer the service to its customers who are generally small businesses or residences. Furthermore, Multilocation Billing ("MLB"),[3] added by AT&T in 1989, allows volume discounts to be apportioned between an SDN customer and individual locations on its network, in a proportion chosen by the customer. Under this option, AT&T sends bills directly to the reseller's customers, however, the reseller remains responsible for all payments. Another billing option offered is the Location Account Billing Option ("LABO"), under which AT&T sends bills to each location at the discount rate, and each location is responsible for payment.
 
 
 11
 AT&T also instituted two tariffed pricing promotions in 1989 which are attractive to resellers. Expanded Volume Pricing plans ("EVPs"), offering additional discounts from the basic SDN rates for customers making large usage and duration commitments, and another promotion which waived the installation charges and per-location installation charges for customers making multi-year commitments, subject to penalties for early termination.
 
 
 12
 Following the 1989 changes in SDN service, orders from resellers increased, and AT&T experienced delays in provisioning SDN, especially switched access service. Billing problems also occurred, most notably, "suppressed billing"[4] which resulted in customers not receiving bills for calls for up to one year after the calls were made.[5]
 
 
 13
 In light of the problems with SDN, AT&T limited the number of new SDN customers. AT&T also transferred servicing of all reseller customers to the Channel Development and Operations Center ("CDOC").[6] The CDOC was the successor to the Carrier Service Center, which had previously done business with AT&T's reseller customers.
 
 
 14
 COT placed orders for SDN, after COT's president became aware of SDN in 1989, and contacted AT&T's Portland office regarding the service. On October 30, 1989, COT signed an agreement for SDN service, and selected Multi Location Billing. AT&T represented to COT that the service would be provisioned in four to five months, and thereafter, additional orders within 30 days. In February, AT&T advised COT that new orders would take 45 to 90 days due to provisioning problems, and informed COT that another AT&T service, Multi Location Calling Plan ("MLCP") would serve COT's customers until they were provisioned onto SDN.
 
 
 15
 COT began reselling SDN services in April 1990, and immediately experienced problems with the network including provisioning delays and suppressed billing. COT also experienced an additional billing problem; COT's customers received 100% of the discount instead of the 50% COT had selected, because COT was billed under the LABO billing option rather than the MLB billing COT had selected. COT continued to experience problems with provisioning and billing, and in October 1990 COT switched from MLB billing to Network Billing, under which AT&T sent COT a single bill which COT was responsible for paying. COT then sent individual bills to its customers.
 
 
 16
 Although COT continued to sell SDN, it was ultimately unable to meet its usage commitment for the first period in which it was applicable. In addition, AT&T claimed that COT had failed to pay nearly $200,000 in bills from the period in which COT was under MLB billing. On September 21, 1992, COT's president informed AT&T that COT was terminating its contract as of September 30, 1992, with 1 1/2 years remaining in the contract.
 
 
 17
 COT filed suit on November 27, 1991. COT ultimately pursued three state law claims at trial: breach of contract, breach of implied covenant of good faith and fair dealing, and tortious interference with contract.[7] COT's state law claims were based on COT's allegation that the contracts entered into with AT&T did not constitute the ordering of long distance pursuant to the requirements of AT&T's tariff, but rather constituted voluntary contracts in which COT agreed to purchase, and AT&T agreed to provide long distance services. COT also claimed that the contracts encompassed more than the written orders, and included all the understandings that COT's president had from reading service brochures and from talking with AT&T representatives.
 
 
 18
 COT argued that AT&T's failure to provision SDN orders in a reasonable manner, failure to properly allocate discounts between COT and its customers under Multilocation Billing, failure to offer SDN and MLCP services which were functional for COT, failure to initially credit MLCP usage to SDN, failure to provide timely call detail to COT and its customers, and failure to afford COT international calling capability at a reasonable completion rate, as well as a requirement that COT post a deposit, and AT&T's provisioning of calling card capabilities under Network Remote Features rather than an SDN calling card bearing both COT's and AT&T's logo, constituted breach of contract.
 
 
 19
 COT also claimed that AT&T breached its state law implied duty of good faith and fair dealing by taking actions that undermined the purpose of the contract, which was to obtain services and resell them at a profit. COT's tortious interference with contract claim alleged that because COT had promised certain benefits of SDN to its customers, and because AT&T provided competing services, any violation of AT&T's contractual duties constituted tortious interference with COT's relationship with its customers.
 
 
 20
 Furthermore, COT alleged that AT&T's conduct was wilful and therefore consequential damages could be awarded under the terms of its tariff. COT claimed the wilful conduct consisted of running a promotion for SDN when AT&T did not have the capability to provision COT and other resellers to the CDOC. COT also argued that improper purpose could be inferred from certain internal AT&T documents discussing proposed SDN changes.
 
 
 21
 At three stages of the proceedings below,[8] AT&T asserted that COT's state law contract and tort claims were preempted by the filed tariff doctrine of § 203 of the Communications Act. The magistrate judge rejected this claim and denied AT&T's Motion for Summary Judgment as to its counterclaim and all of COT's claims, excepting COT's negligent misrepresentation claim. Central Office Tel. Co., Inc. v. AT&T, Civ. No. 91-1236-JE (E.D.Or.1991). In denying AT&T's motion for summary judgment on its counterclaim and on COT's claim for breach of contract, the magistrate judge found AT&T's reading of the filed-rate doctrine too broad. The magistrate judge also found that because COT was not disputing the filed-rate's reasonableness or validity, or that of the tariff in general, but rather was complaining about the manner in which AT&T provided the services for which COT contracted, the filed-rate doctrine did not apply. Id. at 16.
 
 
 22
 The magistrate judge also rejected AT&T's argument that there was no substantial evidence that any of its challenged conduct constituted wilful misconduct within the meaning of its tariff. In addition, AT&T moved to exclude a lost profits study prepared by COT's damage expert, which motion was denied. COT requested that it be allowed to present evidence of AT&T's financial condition in support of its claim for punitive damages, however, the court also denied this request.
 
 
 23
 The jury returned a verdict of $13 million in favor of COT on its breach of contract and intentional interference claims, and also in favor of COT on AT&T's counter-claim for unpaid tariff charges. Judgment was entered on July 1, 1994. AT&T then moved for judgment as a matter of law, for a new trial or for remittitur. The court denied AT&T's motions for new trial and remittitur, and ruled as a matter of law that the filed-rate doctrine did not preempt COT's claims. The magistrate judge also granted AT&T partial judgment as a matter of law and cut-off COT's damages for the period after September 1992, finding there was no competent evidence for this period. The magistrate judge then entered an amended judgment awarding COT $1,154,000. COT moved, pursuant to Fed.R.Civ.P. 59(e), to alter the amended judgment on the grounds that the court had relied on the wrong exhibit when it calculated pre-September damages. The court denied the motion.
 
 
 24
 On appeal, AT&T reiterates its contention that COT's state law claims are preempted by the Communications Act. COT counters that AT&T failed to provide untariffed services and engaged in wilful misconduct, and therefore, the filed-rate doctrine does not apply and its claims are not preempted. Therefore, it must initially be determined whether the magistrate judge was correct in holding as a matter of law that the filed-rate doctrine did not apply to COT's claims. We review a district court's decision regarding motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 de novo. Montiel v. City of Los Angeles, 2 F.3d 335, 342 (9th Cir.1993).
 
 
 25
 AT&T argues that statutory filed tariff requirements preempt any state law claims that a carrier has expressly or impliedly agreed to provide a customer with services that are better or different from that required by the carrier's filed tariffs. Under 47 U.S.C. § 203(a), communications common carriers must file tariffs with the FCC. The tariff-filing requirements were taken from the Interstate Commerce Act ("ICA"), and the Supreme Court has stated that, like rate-filing under the ICA, tariff-filing under the Communications Act is "Congress's chosen means of preventing unreasonableness and discrimination in charges; ... the tariff-filing requirement is the heart of the common-carrier section of the Communications Act." MCI v. AT&T, 512 U.S. 218, 230, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994). The filed tariff doctrine (or filed-rate doctrine) forbids a regulated entity from charging rates for its services other than those filed with the appropriate regulatory authority. Arkansas Louisiana Gas, Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The filed-rate of the carrier is the only lawful rate a carrier may charge, and it is strictly construed. Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990) (interpreting the filed-rate provisions of the ICA); MCI, 512 U.S. at 229-30, 114 S.Ct. at 2231. Furthermore, "the filed-rate governs the legal relationship between the shipper and the carrier." Maislin, 497 U.S. at 126, 110 S.Ct. at 2765.
 
 
 26
 AT&T argues that a long line of Supreme Court Cases establish that the filed-rate doctrine precludes a carrier from entering into "side-deals" which give preference to certain customers and are not defined in the filed-rates.[9] COT argues that AT&T's cases establish that a carrier may not provide special or extra services to certain customers that are not defined in the tariffs, such that the customer actually pays a lower rate. Furthermore, COT argues that it paid the same rates as AT&T's corporate customers and that its claims do not involve the tariff rates.
 
 
 27
 The filed-rate doctrine has two purposes: (1) to preserve the regulating agency's authority to determine the reasonableness of rates; and (2) to insure that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require. H.J., Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485, 488 (8th Cir.), cert. denied, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). Because this case does not involve rates or rate-setting, but rather involves the provisioning of services and billing under several contracts, the filed-rate doctrine does not apply.[10]
 
 
 28
 However, assuming arguendo, that COT's claims are covered by the filed-rate doctrine, the filed-rate doctrine could not apply to any of COT's claims with regard to billing or provisioning. As noted by the magistrate judge, Multi Location Billing, the option originally chosen by COT, was not covered by the tariff. AT&T's tariff expert testified at trial that billing procedures were not covered by AT&T's tariffs. In addition, the mutually agreed upon facts given in the jury instructions state that COT chose MLB, and that it was not covered by the tariff. Furthermore, AT&T's tariff expert also testified at trial that the provisioning of SDN services was not covered by the tariff. Therefore, the filed-rate doctrine could not apply to any of COT's claims with regard to billing or provisioning, even if the doctrine could apply to other aspects of the SDN service.[11]
 
 
 29
 Having determined that COT's claims are not preempted by the filed-rate doctrine, it follows that the magistrate judge was not in error, as AT&T asserts, by failing to instruct the jury that the only issue was whether AT&T violated its tariff through wilful misconduct. Likewise, the magistrate judge did not err in denying AT&T's motion for judgment as a matter of law for unpaid tariff charges owed by COT. AT&T maintains that the same errors of law which applied to its argument that COT's state law and contract claims were preempted by the filed-tariff doctrine require the reversal of the denial of its counterclaim. Previously, AT&T had argued that the filed-rate doctrine barred the application of equitable defenses against the collection of debts incurred pursuant to a tariff filed with the appropriate agency. Maislin, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).
 
 
 30
 The magistrate judge, however, found that COT was not disputing the validity of the rates charged under the tariff, but rather, the accuracy of AT&T's calculations and AT&T's right to collect for services for which COT's customers were not accurately billed. Once again, AT&T bases its argument on the assumption that all rights between AT&T and COT are governed by the tariff. As already discussed, this is not the case.
 
 
 31
 COT argues that AT&T failed to provide the services it was promised, including correct billing.[12] COT also argues that the jury rejected the counterclaim based on the evidence it presented including testimony that COT paid all amounts owed for SDN service, as reflected in COT's records, that approximately $130,000 of alleged unpaid tolls resulted from incorrect AT&T billings and another $68,000-69,000 from unexplained charges, and evidence that AT&T's billing was flawed and showed wild fluctuations. Given that AT&T cannot rely on its filed-rate tariff argument to shield itself from COT's claims and that the evidence presented by COT suggests that AT&T did not properly bill COT, it was not error for the magistrate judge to deny AT&T's motion for judgment as a matter of law on its counterclaim.
 
 
 32
 In addition, AT&T maintains, as it did both during and after trial, that COT's failure to produce any competent evidence of damages is independent ground for reversal of the amended judgment, and that because the testimony of COT's damage expert should not have been admitted, the $1.154 million award should be reversed and judgment entered for AT&T.
 
 
 33
 Evidentiary rulings are reviewed for an abuse of discretion, and should not be reversed absent some prejudice. City of Long Beach v. Standard Oil Co., 46 F.3d 929, 936 (9th Cir.1995); The Monotype Corp. v. Int'l Typeface Corp., 43 F.3d 443, 448 (9th Cir.1994).[13]
 
 
 34
 Initially, the parties disagree over whether state or federal law should apply when determining whether the evidence supports a claim for lost profits. AT&T argues that federal law should apply citing a Fifth Circuit case for this proposition. University Computing Co. v. Management Science, 810 F.2d 1395 (5th Cir.1987). However, in University Computing, the court found that federal law determined the sufficiency of the evidence with reference to state substantive law on lost profits. Id. at 1396. In Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703 (9th Cir.1990), the defendant challenged damage awards as speculative and unsupported by the evidence. Id. at 710. This Court stated that the determination of damages was a question of fact which will not be disturbed unless it is clearly unsupported by the evidence. Id. The Court then laid out the test for lost profits under Washington State Law. Id.
 
 
 35
 Oregon law states that the essential ingredient of proof of lost profits to a reasonable certainty is supporting data. Hardwick v. Dravo Equip. Co., 279 Or. 619, 569 P.2d 588, 591 (1977). Expert testimony alone can provide a sufficient factual basis for an award of lost profits. Milgard, 902 F.2d at 711.
 
 
 36
 After reviewing in detail the method used by COT's expert to calculate lost profits, the magistrate judge, in his order denying in part and granting in part AT&T's motion for judgment as a matter of law, found that COT was not entitled to recover damages for the period following the termination of its contract with AT&T. However, he found that COT's damage expert's study was "sufficiently grounded in objectively verifiable facts and reasonable assumptions to support the jury's award of lost past profits up to COT termination of its SDN sales in September 1992." Thus referring to the standard for lost profits enunciated by the Oregon Supreme Court, the magistrate judge did not abuse his discretion by allowing the testimony to go to the jury.
 
 
 37
 Additionally, COT makes several arguments concerning the errors made by the magistrate judge in limiting its damage award. First COT argues that under Oregon Law, lost profits may be recovered for tort as well as contract actions, and therefore, the magistrate judge erred in limiting the damages to the contract period. The magistrate judge, however, limited the damage award to the contract period because he found that determining damages beyond that period was too speculative, not because he found that damages should only encompass the term of the contract. In reviewing the size of jury verdicts, the proper role of trial and appellate courts in the federal system is a matter of federal law. Donovan v. Penn Shipping Co., 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977) (per curiam). The district court determines whether the jury's verdict is within the confines of state law. Browning-Ferris Indus. of Vt., Inc. v. Kelco Disp., Inc., 492 U.S. 257, 279, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989). Under Oregon law lost profits damages must be proven to a reasonable certainty. Welch v. Bancorp Realty and Mortgage Trust, 286 Or. 673, 596 P.2d 947, 964 (1979); Hardwick v. Dravo Equip. Co., 279 Or. 619, 569 P.2d 588, 591 (1977). An essential ingredient of proof of lost profits to a reasonable certainty is supporting data. Hardwick, 569 P.2d at 591.
 
 
 38
 COT contends that the magistrate judge improperly applied an absolute certainty test when he determined that COT's expert's testimony was insufficient because he did not know the number of salespeople COT employed after 1990, and because he based his projections on 10 salespeople when in fact COT employed only four. Although the magistrate judge found no evidence to support this opinion, COT argues that it was supported by COT's president who testified that he intended to hire two more salespeople and to open additional offices. However, COT points to no evidence which indicates these plans would have come to fruition had COT not terminated its contract with AT&T.[14] Therefore, it cannot be said that the magistrate judge applied an absolute certainty standard by finding that experts must have some verifiable basis for their opinion.
 
 
 39
 COT also maintains that the magistrate judge impermissibly reweighed the evidence when he found fault with the expert's failure to make specific allowance for bad debts and failure to account for the effect of technological changes. Although it is true that the court should not re-weigh the evidence, Garvin v. Greenbank, 856 F.2d 1392, 1396 (9th cir.1988), the court must still view the evidence in the light most favorable to the non-moving party to determine if the verdict is supported by substantial evidence. Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1151 (9th Cir.1988). As to both of these factors, the magistrate judge could find no basis for the expert's opinions other than the expert's own assumptions.[15]
 
 
 40
 Other problems identified by the magistrate judge included, the expert's failure to account for the fact that COT intended to do its own billing in the future, the expert's assumptions that the discount levels would remain constant through the year 2000, his failure to talk to any customers or provide for possible competition, and his failure to research similar services provided by other companies before declaring SDN to be a unique product. This latter point, the magistrate judge stated, was very significant because a reseller can recover profits lost by a supplier's failure to deliver if no substitute can be found.[16] Relatedly, the magistrate judge found that the expert had considered all profits that COT might have realized through selling SDN as lost, without accounting for increased effort and sales of services provided by AT&T competitors.
 
 
 41
 Finally, the magistrate judge found that COT's expert failed to take into account that the problems COT encountered with AT&T's SDN services would have continued throughout the contract period and into the future. The magistrate judge therefore held that the expert testimony was not sufficient to support seven years of lost profits recovery.
 
 
 42
 Given the myriad of flaws identified by the magistrate judge, it does not appear that, even viewing the evidence in the light most favorable to COT, AT&T was not entitled to judgment as a matter of law on the post-contract claim.
 
 
 43
 In the alternative, COT argues that if this Court finds that the jury verdict was not supported by substantial evidence, the district court must nevertheless be reversed because the magistrate judge improperly reduced the jury award in violation of the Seventh Amendment. The Seventh Amendment controls the allocation of authority to review verdicts in federal courts. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). The Supreme Court has held that the re-examination clause of the amendment does not inhibit the power of the trial judge to grant new trials or to order remittitur. Gasperini, 518 U.S. at ----, 116 S.Ct. at 2222.
 
 
 44
 Upon motion for a new trial, a trial court, finding a verdict excessive may either order a new trial or deny the motion conditional on the party accepting a remittitur. Fenner v. Dependable Trucking Co., Inc., 716 F.2d 598, 603 (9th Cir.1983). COT argues that it should have been given this option before the jury's award was reduced. However, the magistrate judge did not reduce the award upon AT&T's motion for a new trial, but rather upon their motion for judgment as a matter of law. Rule 50 of the Federal Rules of Civil Procedure allows a court to set aside the verdict of the jury and enter judgment as a matter of law, and has been held to be constitutionally compatible with the Seventh Amendment. Gasperini, 518 U.S. at ---- n. 20, 116 S.Ct. at 2224 n. 20; Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 2522 pp. 241-42 (2d ed. 1995). The magistrate judge's action under Rule 50 does not appear to be in conflict with the Seventh Amendment.
 
 
 45
 Furthermore, COT also argues that the magistrate judge improperly granted judgment as a matter of law based on a truncated trial record. COT asserts that it is reversible error for a district court to admit an expert's lost profit evidence at trial then, after eliminating the expert's evidence post-trial, and to grant judgment as a matter of law. See Midcontinent Broadcasting Co. v. North Central Airlines, Inc., 471 F.2d 357, 358-59 (8th Cir.1973) (holding same). Although it is true, as COT states, that a trial judge must consider all the evidence submitted in ruling on a motion for judgment as a matter of law, contrary to COT's position, the magistrate judge did not only consider a portion of the evidence submitted to the jury. Instead, the magistrate judge considered the entirety of the testimony of COT's expert, found that he should not have allowed the post-contract period evidence to be submitted, then reduced the jury's damage award. Therefore, COT's argument on this issue is misplaced.
 
 
 46
 The final issue on appeal concerns COT's punitive damage request. COT argues that, under Oregon law, when a plaintiff establishes a prima facie case of intentional interference with business relations, the plaintiff is entitled to present evidence of the defendant's financial condition in support of its claim for punitive damages. Or.Rev.Stat. 41.315. COT asserts that it presented a prima facie case of intentional interference with business relationships, survived AT&T's motion for judgment as a matter of law and convinced the jury that AT&T was an intentional tortfeasor, and therefore the magistrate judge erred in withholding its punitive damage claim from the jury.
 
 
 47
 Whether to award punitive damages is a question of state law and is, therefore, reviewed de novo. Mapes v. United States, 15 F.3d 138, 140 (9th Cir.1994). This Court must apply Oregon's law as the Oregon Supreme Court would apply it. Intel Corp. v. Hartford Accident & Idem. Co., 952 F.2d 1551, 1556 (9th Cir.1991). Under Oregon Law, punitive damages are available when there is evidence of malicious or wanton conduct.[17] Van Lom v. Schneiderman, 187 Or. 89, 210 P.2d 461 (1949). When punitive damages are sought, the judge determines whether there is evidence of malice as a matter of law, and if he decides there is, the assessment of damages is committed to the jury's discretion. Van Lom, 210 P.2d at 469. This court has determined that punitive damages may be awarded under Oregon State law for the tort of tortious interference with an economic relationship, Kraus v. Santa Fe Southern Pac. Corp., 878 F.2d 1193 (9th Cir.1989), cert. dismissed, 493 U.S. 1051, 110 S.Ct. 1329, 107 L.Ed.2d 850 (1990), and Oregon courts have held that punitive damages may be awarded for tortious interference with a business relationship if actual damages are awarded on the same claim. Employers' Fire Ins. Co. v. Love It Ice Cream Co., 64 Or.App. 784, 670 P.2d 160 (1983) (citing Belleville v. Davis, 262 Or. 387, 498 P.2d 744 (1972)).
 
 
 48
 COT argues that, having prevailed on its claim for tortious interference with contract, the magistrate judge erred in not instructing the jury on punitive damages. In denying COT's instruction on punitive damages and not allowing COT to introduce evidence of AT&T's financial condition, the magistrate judge noted his concerns over prejudicing the jury. However, because this Court conducts de novo review on this issue, and in light of the jury verdict in this case, it appears that the punitive damage instruction should have been given. The Oregon Supreme Court has held that when an error affects only the availability and amount of punitive damages, it is appropriate to remand that case for trial on those issues. Honeywell v. Sterling Furniture Co., 310 Or. 206, 797 P.2d 1019, 1023 (1990). Therefore, it is appropriate to remand the case for a new trial on the issue of punitive damages.
 
 
 49
 For the foregoing reasons, the magistrate judge's post-trial judgments are affirmed. However, his decision not to submit punitive damages evidence to the jury is reversed, and the case remanded on the issue of punitive damages.
 
 
 50
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 BRUNETTI, Circuit Judge, dissenting:
 
 51
 I dissent because I believe that the filed-rate doctrine preempts COT's state-law claims. I would reverse the magistrate judge's legal conclusion that the doctrine does not do so and mandate that the court dismiss COT's preempted state-law claims.
 
 
 52
 The majority concludes that the filed-rate doctrine does not preempt COT's claims because: (a) the case involves the provisioning of services rather than rate-setting; or alternatively, (b) the services at issue were not covered by the tariff. Both proffered reasons misinterpret the filed-rate doctrine.
 
 
 53
 A. Both Rates and Corresponding Services Are Covered by the Filed-Rate Doctrine.
 
 
 54
 To avoid being an empty letter, the filed-rate doctrine must encompass both rates and the services corresponding to those rates. The opinion erroneously narrows the scope of the doctrine by stating that "[b]ecause this case does not involve rates or rate-setting, but rather involves the provisioning of services and billing under several contracts, the filed-rate doctrine does not apply."
 
 
 55
 The Communications Act provides that "[e]very common carrier ... shall ... file with the Commission and print and keep open for public inspection schedules showing all charges ... and showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). The plain language of the statute mandates that tariffs include both rates and underlying services. Limiting the filed-rate doctrine to the rate-setting portion of the tariff undermines the goal which Congress expressed in section 203(a): the provision of rates and services in a nondiscriminatory manner.
 
 
 56
 In its most recent examination of this issue, the Supreme Court repeatedly stressed section 203(a)'s importance: "[t]he tariff-filing requirement is ... the heart of the common-carrier section of the Communications Act." MCI v. AT&T, 512 U.S. 218, 229-30, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994). "[R]ate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges...." Id. "Rate filings are, in fact, the essential characteristic of a rate-regulated industry." Id. at 231, 114 S.Ct. at 2232.
 
 
 57
 Although the majority's interpretation would hold otherwise, rates have no meaning unless tied to corresponding services. Yet the majority argues that only the rate portions of the tariff are subject to preemption. Extending this analysis, carriers would be bound only to those rates and not to the corresponding services. If this were so, carriers could easily devise schemes to avoid the Communications Act's fairness requirements. In truth, regulation of rates divorced from services amounts to no regulation at all. For the requirements of the Communications Act to possess any import, both the rates and corresponding services must be covered by the filed-rate doctrine.
 
 
 58
 An examination of the tariff at issue illustrates this point. AT&T's tariff prescribes not only the rates for various types of services, but also AT&T's rights and liabilities in each of the areas in which COT claims that AT&T breached its obligations. These include: provisioning orders, billing, providing calling cards, requiring deposits and providing the long distance service itself. See, e.g., AT&T Tariff F.C.C. No. 1, § 2.5.10 (provisioning), § 6.2.4 (billing), § 2.5.12.B (calling card), § 2.5.6 (deposits), § 6.2.5 (service support). The service specifics are clearly delineated in the tariff itself.
 
 
 59
 It is both counterintuitive and inconsistent with the traditional importance of the Communications Act to suppose that the filed-rate doctrine would encompass the rates in the tariff, but not the services contained in the same document. See MCI, 512 U.S. at 219-25, 114 S.Ct. at 2226-28 (detailing historical importance of Communications Act). To hold that anything less than all material aspects of the provided services are covered by the tariff eviscerates the "heart" of the Communications Act.
 
 
 60
 B. Because the Services at Issue Were Not Covered by the Tariff, COT's Claims Are Preempted.
 
 
 61
 The majority also concludes that the filed-rate doctrine does not preempt COT's claims because the tariff did not cover the services at issue. Although they are correct in asserting that the services were not in the tariff, it is precisely for this reason that COT's claims are preempted. AT&T is simply barred from contracting for non-tariffed services. To analyze this transaction it is necessary to examine both the filed-rate doctrine and the specific tariff at issue.
 
 
 62
 In its most general terms, a filed tariff controls the legal relationship between a long-distance carrier and its customers. See Maislin Indus. v. Primary Steel, Inc., 497 U.S. 116, 126, 110 S.Ct. 2759, 2765, 111 L.Ed.2d 94 (1990) ("This Court has long understood that the filed rate governs the legal relationship between shipper and carrier."). As the authorities cited by the majority acknowledge, AT&T is not allowed to provide services without filing a tariff setting the rate and all "classifications, practices, and regulations" corresponding to the rate. Furthermore, "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier...." Id. (quoting Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 49-50, 67 L.Ed. 183 (1922)). If AT&T could simply contract for untariffed services, it would never have to file a tariff in the first place and the filed-rate doctrine would be rendered meaningless.
 
 
 63
 However, COT argues, and the majority agrees, that AT&T entered into an enforceable contract for services which were not covered by the tariff. This argument misreads the filed-rate doctrine, which expressly prohibits a carrier from contracting for services not covered by the published tariff.
 
 
 64
 Chicago & Alton R.R. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912), a case the majority addresses in a footnote, illustrates the operation of the doctrine. (Majority Opinion, footnote number 9). In Kirby, a carrier contracted with a shipper to deliver cargo on a expedited basis. When the carrier failed to perform, the shipper sued for breach of contract. The Supreme Court held that the contract was invalid under the filed-rate doctrine because the carrier's tariffs "did not provide for an expedited service, nor for transportation by any particular train" and gave "an advantage or preference not open to all and not provided for in the published tariffs." Id. 163-66, 32 S.Ct. at 650. See also Davis v. Cornwell, 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848 (1924), Atchison, T. & S.F. Ry. v. Robinson, 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901 (1914).
 
 
 65
 The majority attempts to distinguish Kirby and its progeny by reasoning that COT is not seeking to obtain for the tariffed rate extra services not covered in the tariff, but is merely seeking the same services provided to AT&T's other customers. This is incorrect. COT is seeking services that are not covered in the tariff at the tariffed rate.
 
 
 66
 The majority also argues that COT's claims are not preempted because MLB, the option originally chosen by COT, was not covered by the tariff. Although the magistrate judge ruled that MLB was not a tariffed service, that decision is irrelevant to the result here. If the majority and the magistrate judge correctly identify MLB as a non-tariffed service, then Kirby dictates that AT&T was prohibited from entering into that agreement and it is now invalid. If, as AT&T claims, MLB was a tariffed service, then the filed-rate doctrine prohibits COT's state law claims. In either case, COT has no state-law claims against AT&T for MLB service.
 
 
 67
 The majority utilizes AT&T's expert testimony to conclude that neither the billing procedures nor the provision of SDN services were covered by the tariff. Again, this is of no import. If those service were not covered by the tariff, the agreements were invalid and COT cannot now attempt to enforce them. If they were tariffed, they are preempted by the filed-rate doctrine.
 
 
 68
 While the filed-rate doctrine may create harsh consequences in some instances, the Supreme Court has consistently adhered to it because of the overarching policy of the Act, namely, prevention of discrimination. See Maislin, 497 U.S. at 128, 110 S.Ct. at 2766-67. Accordingly, a court is required to ignore allegations of fraud or other inequitable conduct in determining whether to apply the doctrine. "Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 489 (8th Cir.), cert. denied, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992). An examination of the filed tariff at issue, AT&T Tariff F.C.C. No. 1, proves instructive for this purpose.
 
 
 69
 Initially, the tariff sets forth the provisioning standards for establishing and confirming a due date when an order for SDN service is placed. In addition, AT&T must "make every reasonable effort to assure" that it is delivered on time, but if there is a delay in excess of 45 days, "the Customer may cancel the order without penalty or payment or nonrecurring charges." (§ 2.5.10.B). Under the tariff, the customer is responsible for payment of bills, except for the Location Account Billing Option, to which COT did not subscribe. For that option, AT&T "is not responsible for the way the Customer may allocate usage or charges among multiple Users." (§ 6.2.4).
 
 
 70
 For calling cards, the tariff provides that "[c]alls charged to a Local Exchange Company Calling Card or an AT&T Card will ... be included on the LDMTS bill for the Main Billed Account with which the card is associated." (§ 2.5.12.B). The tariff also delineates deposit provisions for customers who have a "proven history of late payments ... or whose financial responsibility is not a matter of record." It requires those customers to "make a deposit to be held as a guarantee for the payment of charges." (§ 2.5.6.A).
 
 
 71
 The tariff's service provision states that "Custom Network Services are fully supported by the Company through engineering, installation and maintenance efforts. The Company will assure that each service functions properly within its specified transmission and switching parameters." (§ 6.2.5). "When installation of a component is required it will be installed subject to the availability of installation personnel and equipment." (§ 6.2.5.B).
 
 
 72
 As these excerpts illustrate, the tariff is an exhaustive document, covering numerous types of service and contingencies between AT&T and its customers. The above-cited sections are material to COT's claims concerning delay and provisioning and its claims should have been addressed by looking to the tariff's provisions in the context of the Communications Act.
 
 
 73
 AT&T adopts this position, arguing that the filed-rate doctrine preempts COT's claims because COT is seeking to enforce a contract for services not provided for in the tariff. COT is therefore impermissibly seeking "an advantage or preference not open to all and not provided for in the published tariffs." Kirby, 225 U.S. at 166, 32 S.Ct. at 650.
 
 
 74
 As noted earlier, COT counters that the filed-rate doctrine does not apply because COT was not demanding better service for the tariffed rate. Instead, COT argues that "while COT paid the same rates as AT&T's favored corporate customers, COT was given inferior SDN service and denied SDN features that were provided to AT&T's favored customers." However, if this truly were COT's claim, its remedy was to bring a suit for discrimination under 47 U.S.C. §§ 202, 206, and 207.[1]
 
 
 75
 COT also argued that "it is elementary" that the filed-rate doctrine does not apply to untariffed services, or in other words, that common-law applies to fill in gaps left in tariffs. The majority accepts this contention. However, none of the three cases cited by COT support this "elementary" proposition. MCI v. Credit Builders of Am., Inc., 980 F.2d 1021, 1022-23 (5th Cir.), vacated, 508 U.S. 957, 113 S.Ct. 2925, 124 L.Ed.2d 676, reinstated, 2 F.3d 103, cert. denied, 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 424 (1993), holds only that a carrier's suit to collect unpaid tariffed charges does not "arise under" federal law within the meaning of 28 U.S.C. §§ 1331 and 1337. This holding is irrelevant to this case.[2] Security Servs. Inc. v. K Mart Corp., 511 U.S. 431, 443-45, 114 S.Ct. 1702, 1710, 128 L.Ed.2d 433 (1994), held only that a carrier cannot base a rate collection action on a tariff that is void. This is also inapplicable here.
 
 
 76
 Finally, US Wats, Inc. v. AT&T, No. Civ.A 93-1038, 1994 WL 116009 (E.D.Pa. Apr.5, 1994), comes closest to supporting COT's proposition. There, the district court rejected AT&T's argument that the filed-rate doctrine preempted the plaintiff's breach of contract claim for refusing to transfer end users from one SDN to another because such a claim "will neither result in rate discrimination nor embroil the court in a dispute over the reasonableness of AT&T's charges in contravention of the FCC's ratemaking authority." Id. at * 5.[3] Under US Wats, COT's claims are viable only if they would not result in rate discrimination.[4]
 
 
 77
 In footnote number 9, the majority cites Kirby, Davis and Atchison to refute AT&T's argument that "the filed-rate doctrine precludes a carrier from entering into 'side-deals' which give preference to certain customers and are not defined in the filed-rates." However, these cases all dealt with service provisions that were not specified in the tariff. It was precisely because the service provisions were not included in the tariff that the Supreme Court held that they were not enforceable as a matter of contract law.
 
 
 78
 COT also argues that the "savings clause" of 47 U.S.C. § 414 preserves its state-law claims. That section states: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." Initially, it is important to note that the Interstate Commerce Act contained an identical savings clause at the time of the Supreme Court's decision in Kirby. See 49 U.S.C. § 22.
 
 
 79
 In Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), the plaintiff brought a common-law state action arguing that a shipper's published rates were unreasonable and discriminatory. Id. at 430, 27 S.Ct. at 351. The Court held the action to be preempted despite the savings clause. Id. at 446, 27 S.Ct. at 357-58. As later described in Nader v. Allegheny Airlines, 426 U.S. 290, 298-99, 96 S.Ct. 1978, 1984-85, 48 L.Ed.2d 643 (1976), the Abilene Cotton Court "found that the continuance of private damages actions attacking the reasonableness of rates subject to the regulation of the Interstate Commerce Commission would destroy the purpose of the Interstate Commerce Act, which was to eliminate discrimination by requiring uniform rates."
 
 
 80
 In Nader, the plaintiff brought a common-law action against an airline seeking damages sustained as a result of its overbooking practices. 426 U.S. at 292-93, 96 S.Ct. at 1981-82. The Court, distinguishing Abilene Cotton, concluded that the action was not preempted because the Court was not being called upon to make a determination of the reasonableness of a rate or practice that could be contrary to the regulatory agency's decision. Id. at 299, 96 S.Ct. at 1984-85. Any impact on rates, reasoned the Court, "would be merely incidental." Id. at 300, 96 S.Ct. at 1985.
 
 
 81
 In Cooperative Communications, Inc. v. AT&T, 867 F.Supp. 1511 (D.Utah 1994), an aggregator brought suit against AT&T. The district court held that the savings clause "preserves causes of action for breaches of duties distinguishable from those created under the Act." Id. at 1516. In other words, "state-law remedies which do not interfere with the Federal government's authority over interstate telephone charges or services, and which do not otherwise conflict with an express provision of the Act, are preserved by section 414." Id. (quoting Kellerman v. MCI, 112 Ill.2d 428, 98 Ill.Dec. 24, 493 N.E.2d 1045, 1051, cert. denied, 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986)). The plaintiff alleged that AT&T attempted to drive it out of business by making intentional misrepresentations to the plaintiff's clients, by misappropriating plaintiff's confidential client billing information, and by attempting to destroy plaintiff's customer base. Id. at 1514. The court held the claims based on these allegations were not preempted. Id. at 1516.
 
 
 82
 Cooperative Communications is distinguishable because it did not involve a relationship between AT&T and its customer and did not implicate AT&T's duties under § 203. Because COT's claims seek better (or different) service than is published in AT&T's tariff, the savings clause does not save COT's claims. As in Kirby, the plaintiff's claims interfere with the purpose of the Act because they seek treatment that is different from the published tariff.
 
 
 83
 COT also argues that even if the filed-rate doctrine applies, its state-law claims remain viable because it was required to prove, in accordance with the tariff, that AT&T engaged in "willful misconduct." The tariff provides that the "Company's liability, if any, for its willful misconduct is not limited by this tariff." (§ 2.3.1.A.) AT&T argues that COT's claims are nevertheless preempted because the "willful conduct" consisted of willfully failing "to implement the very alleged side deals that are illegal and that would have given COT illegal preferences over other similarly-situated customers (i.e. resellers)."
 
 
 84
 AT&T's argument is supported by Supreme Court precedent. In Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), the Court held that a passenger who purchased a train ticket at a rate misquoted by the ticket agent did not have a defense against the subsequent collection of the higher tariff rate by the railroad. As described by the Court in Maislin, the Maxwell Court's approach "was deemed necessary to prevent carriers from intentionally 'misquoting' rates to shippers as a means of offering them rebates or discounts." 497 U.S. at 127, 110 S.Ct. at 2766.
 
 
 85
 That AT&T willfully broke its "agreements" with COT should not alter the Kirby preemption analysis. If it could, the Kirby approach to the filed-rate doctrine would be rendered a nullity. That the tariff did not limit AT&T's liability for "willful misconduct" does not mean that COT should not still have to pursue damages for such misconduct through §§ 202, 206 and 207 of the Act.
 
 C. Conclusion
 
 86
 The outcome that I advocate may appear inequitable. I share the majority's concerns about AT&T's conduct in its dealing with COT. However, the Supreme Court has consistently ruled that the filed-rate doctrine's precepts outweigh any equitable issues. We may question the wisdom of the filed-rate doctrine, but it is the law of the land. See MCI, 512 U.S. at 234, 114 S.Ct. at 2233. ("[O]ur estimations ... of desirable policy cannot alter the meaning of the Federal Communications Act of 1934.")
 
 
 87
 I dissent because the majority's decision is a significant one. The result will allow COT to conduct another trial, where it will present evidence about how badly AT&T treated it and in which the only determination for the jury will be the amount of punitive damages to award to COT. Although this would be the correct disposition if COT's claims were not preempted, I believe that the filed-rate doctrine bars those claims. Therefore, I dissent.
 
 
 
 *
 The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Among these are § 203(a)'s requirement that all common carriers (except connecting carriers) file a tariff showing all charges for itself and its connecting carriers' services, and the classifications, practices and regulations affecting such charges with the FCC, and § 203(c)'s prohibitions against charging different rates for services than those named in the filed schedules, and against "extend[ing] to any person any privileges or facilities, ... or employ[ing] or enforc[ing] any classifications, regulations, or practices affecting such charges, except as specified in the schedule." 47 U.S.C. § 203(c)
 
 
 [2]
 Switchless resellers are firms that purchase "bulk" long distance services from carriers and resell them to their own customers. They qualify for volume discount plans by aggregating the business of multiple customers who would not individually qualify for volume discounts. The reseller is the customer of AT&T and the end users are the customers of the reseller
 
 
 [3]
 AT&T contends that MLB is a tariffed service. However, in ruling on AT&T's motion for judgment as a matter of law, the magistrate judge held that "[MLB], a subject of considerable contention in this dispute, is an untariffed service that is subject to a separate agreement between the parties."
 
 
 [4]
 Suppressed billing occurs when a location is on the SDN network but does not have a "billing guide" in place to match its phone usage billing record. The billing system therefore has nowhere to register the call and the calls are lumped into an "unbilled" toll group until the billing guide is set up. Once the guide is set up, the customer is billed for past unbilled calls
 
 
 [5]
 COT was still experiencing billing problems in 1992 when it filed suit
 
 
 [6]
 The CDOC has two locations, one in Pleasanton, California, the other in Piscataway, New Jersey
 
 
 [7]
 Because the magistrate judge treated the first two claims as one breach of contract claim, COT states that only two claims were before the jury
 
 
 [8]
 Before trial, AT&T moved for partial summary judgment on its counter-claim for unpaid tariffed charges, and for summary judgment on the then remaining seven state law claims made by COT in its Amended and Supplemental Complaint. COT disputes that AT&T specifically raised the issue of preemption. However, AT&T did argue that "the filed tariff doctrine requires entry of judgment in favor of a carrier, even though its customer has state law claims related to the reasonableness of the tariff rates or charges." Def.Mot. in Supp. of Mot. for Summ.Jmt. at 22. After trial, AT&T moved for a directed verdict on COT's breach of contract and breach of implied covenant claims, arguing, inter alia, that COT's state law contract claims were barred by the filed tariff doctrine and preempted by the Communications Act. AT&T's Mem. in Supp. of Mot. for Directed Verdict. AT&T reiterated this argument in its Motion For Judgment as a Matter of Law following the jury verdict
 
 
 [9]
 AT&T cites several cases in support of this argument including: Chicago & Alton R.R. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912) (holding a contract between a carrier and a shipper, under which the shipper guaranteed racehorses would be shipped on certain train, invalid because it was not published in the tariffs and gave one shipper an advantage not available to all), Davis v. Cornwell, 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848 (1924) (holding agreement to provide a shipper a number of railroad cars on a specified day invalid because the tariff did not provide for specification of shipping date); Atchison, T. & S.F. Ry. v. Robinson, 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901 (1914) (holding an agreement to provide expedited shipping not enforceable because it was not contained in carrier's tariff). As pointed out by COT and stated explicitly in Chicago, the agreements cited in these cases were for special expedited shipping services for which the customer would have been expected to pay a higher rate. The Court thus found that the special service should have been included in the tariff and made available to all. 255 U.S. at 165. COT contends that AT&T provided special services to others, but denied them to COT. There is no allegation by either AT&T or COT that COT did not pay the same rates as others who sought the same services from AT&T, nor does AT&T contend that COT should have paid higher rates than those in the tariffs
 
 
 [10]
 In Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 19 (2d Cir.1994), the Second Circuit noted that there are two corresponding interests involved with the filed-rate doctrine which have turned up in Supreme Court decisions: the justiciability of determining reasonable rates, and the potential discrimination in rates between ratepayers. Both of these interests involve the payment of rates and do not refer to contractual obligations to provide services as AT&T contends. AT&T argues that the filed-rate doctrine does not only apply to rates, citing Western Union Telegraph Co. v. Esteve Bros. & Co., 256 U.S. 566, 571-72, 41 S.Ct. 584, 586-87, 65 L.Ed. 1094 (1921). This case in fact involved two classes of rates. Messages sent at the lower rate were sent only once and provided for limited liability for messages not received. The other, was more expensive and provided that messages would be repeated. The court found that the limitation of liability was part of the rate because the customer accepted the risk of the message being wrongly transmitted by choosing the cheaper rate and having the message sent only once. The Court further found that allowing recovery of damages to those who chose a lower rate would create a preference over those who paid the higher rate to insure their message was transmitted correctly. Id
 
 
 [11]
 In addition, AT&T's expert testified that the provisions of the tariffs do not apply to the relationship of AT&T to the reseller, but rather, only apply to the relationship between AT&T and the end user
 
 
 [12]
 The parties do not dispute that COT paid all charges owed after it took over billing for itself, following AT&T's inability to correctly bill COT's customers as promised
 
 
 [13]
 AT&T asserts that the proper standard is de novo review, citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311 (9th Cir.), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). However, the de novo standard enunciated in Daubert applies to scientific evidence under Fed.R.Evid. 702 and there is no indication that the standard is meant to apply to all expert testimony
 
 
 [14]
 COT points to Hardwick for the proposition that lost profits calculations which project additional employees for the damages period meet the substantial certainty test. 569 P.2d at 591. However, in Hardwick, the additional projected employees were based on the number of people that plaintiff would have needed if the log loader at issue in the breach of contract case had not been defective
 
 
 [15]
 COT argues that AT&T's own witness testified that COT would remain viable until 1998. However, although this testimony may have been offered to the jury, the future technological status of SDN was not included by the expert in his forecast of lost profits, and is a different issue entirely
 
 
 [16]
 For this proposition, the magistrate judge cited Calbag Metals Co. v. Atkinson Co., 95 Or.App. 514, 770 P.2d 600, 602-03 (1989); United Engine Parts, Inc., v. Ried, 283 Or. 421, 584 P.2d 275 (1978); Consolidated Data Terminals v. Applied Digital Data Sys., 708 F.2d 385, 394-95 (9th Cir.1983)
 
 
 [17]
 The Oregon Supreme Court has sanctioned the award of punitive damages "whenever there was evidence of a wrongful act done intentionally, with knowledge that it would cause harm to a particular person or persons." McElwain v. Georgia-Pacific Co., 245 Or. 247, 421 P.2d 957 (1966)
 
 
 [1]
 On October 22, 1993, eight months after the discovery cut-off and long after the two-year statute of limitations had run (see 47 U.S.C. § 415), COT sought leave to filed a second amended complaint to add a claim that AT&T had engaged in discrimination against resellers in violation of § 202. The magistrate denied COT leave to file this amended complaint and COT does not appeal from this ruling
 
 
 [2]
 In any event, Ninth Circuit case-law holds the contrary position. Sea-Land Serv. Inc. v. Murrey & Son's Co., 824 F.2d 740, 744 (9th Cir.1987)
 
 
 [3]
 In addition, it is arguable that US Wats was incorrectly decided because the plaintiff in that case should have properly brought a claim for discrimination under § 202(a) or unreasonable practices under § 201 rather than a claim for breach of contract
 
 
 [4]
 The two claims that went to trial-breach of contract and tortious interference with COT's contracts with its customers-both dealt with AT&T's alleged failure to provide SDN service in accordance with its "contract" with COT. This contract consisted of the tariff plus any oral or written statements not inconsistent with the tariff. Among other claims, COT alleged that AT&T breached the contract by failing to allocate properly the discounts between COT and its customers under Multilocation Billing, and by failing to provide SDN and MLCP services that were "functional" for COT. These claims either allege that AT&T failed to provide service according to the tariff, or are seeking to obtain services according to procedures that are not provided for in the tariff. Either way, COT's claims are preempted